GAS LIGHT COMPANY OF COLUMBUS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gas Light Co. v. Commissioner
Docket No. 12620-78.
United States Tax Court
T.C. Memo 1986-118; 1986 Tax Ct. Memo LEXIS 495; 51 T.C.M. (CCH) 685; T.C.M. (RIA) 86118; March 24, 1986. *495 Petitioner, a State-regulated natural gas utility company, collected customer deposits from customers who did not have established credit records. An order by the Georgia Public Service Commission required petitioner to refund a customer deposit if the customer established a record of prompt payment for a period of 24 months. If service was terminated before a customer established such a record, then petitioner's practice was to first apply the customer deposit to any outstanding balance in the customer's account and then refund any remaining amount of the customer deposit to the customer. Held: (1) The customer deposits are primarily for the purpose of prepayment for goods and services and, thus, are includable in petitioner's income as advance payments. City Gas Co. of Florida v. Commissioner,689 F.2d 943 (CA11 1982), revg. 74 T.C. 386 (1980), applied in accordance with Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (CA10 1971). (2) The customer deposits are advance payments (sec. 1.451-5(a), Income Tax Regs.) with respect to agreements for the sale of inventoriable goods, and so the year of inclusion in come is determined under section 1.451-5(c), Income Tax Regs. *496 (3) Treatment of the customer deposits as advance payments constitutes a change in petitioner's method of accounting for that item. Respondent's section 481 adjustment is largely sustained. Howell Hollis and Gary L. Coulter, for the petitioner. Albert L. Sandlin, Jr., for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal corporate income tax against petitioner for its taxable years ending August 31 of 1971, 1972, 1973, and 1975, [1] in the amounts of $126,916.04, $12,397.05, $118,600.54, and $178,043.58, respectively. After settlement of other issues, the issues for decision [2] *497 are as follows: (1) Whether customer deposits received by petitioner are includable in petitioner's income. (2) If so, then (a) in what years the payments are includable, and (b) whether there has been a change of accounting method which results in a section 481[3] adjustment. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner's principal office and place of business was in Columbus, Georgia. Petitioner is an intrastate public utility company regulated by the Public Service Commission of Georgia (hereinafter sometimes referred to as "the PSC"). Petitioner's primary business is, and during the years involved in the instant case was, the acquisition, distribution, and sale of natural gas to residential, commercial, and industrial customers in that part of the metropolitan Columbus, Georgia, area that is in Georgia. Petitioner maintains its books and prepares its Federal corporate income tax returns using the accrual method of accounting. Petitioner also maintains its books of accounts [4] in accordance with the Uniform System of Accounts as prescribed by the National Association of Railroad and Utility Commissioners [5] (hereinafter sometimes referred *498 to as "NARUC"). NARUC's Uniform System of Accounts follows the Federal Power Commission's [6] system of accounts with respect to liquid natural gas properties. During the years in issue in the instant case, petitioner required customer deposits from any customer who did not have an established credit record with petitioner. [7] *499 Petitioner would not furnish gas to a customer who was required to make a customer deposit if the customer could not make such a deposit or get someone to guarantee payment of the bill. Petitioner required these customer deposits in order to insure payment of the customer's final bill of account. During the years in issue in the instant case, petitioner had customer deposits from about two-fifths of its total residential customers. The amount of the customer deposit required by petitioner rose over the years. During the period from 1971 until 1975 or 1976, the required deposit generally was $25. This amount was designed to cover a 2-month bill. The generally required amount was increased to $35 at some point in 1975 or 1976. [8]
When a customer made a customer deposit with petitioner, the customer signed a document entitled "CUSTOMER'S DEPOSIT RECEIPT". This document contains the following agreement: As security for the performance of a certain contract for service supplied at the above address, or continuation of similar service at other addresses. Said amount to be returned at date of discontinuance, provided all bills are paid to that date and all terms of said contract have been duly complied with. Interest to be paid on this amount at the rate and in the manner *500 prescribed by the Georgia Public Service Commission. This receipt is not transferable, and must be returned when refund of deposit is requested, and is void when the deposit is refunded or applied on account. This Receipt is Not Negotiable [9]
Account 235 of NARUC's Uniform System of Accounts provides that the customer deposits account maintained by utility companies "shall include all amounts deposited with the utility by customers as security for the payment of bills." This account is a current liability account. During the years in issue in the instant case, customer deposits received by petitioner were not reflected in petitioner's books as income or included in taxable income, but were carried on its books as liabilities. When petitioner received the customer deposits, it deposited them in its general bank account, thus commingling the customer deposits funds with petitioner's other funds. Until and unless it came time to refund the customer's customer deposit, petitioner's use of the customer deposit funds was unrestricted. On December 16, 1937, the PSC first prescribed a standardized rate of interest *501 which electric and gas utility companies had to pay to customers on their customer deposits. In early 1971, the PSC considered prescribing a higher rate of interest on all customer deposits held by electric and gas utility companies operating in Georgia. On March 24, 1971, the PSC held a hearing on this matter. Petitioner was one of the utility companies which appeared at the PSC's hearing in opposition to the proposed interest rate increase. Testimony introduced by petitioner at this hearing showed that some of the customer deposits and the accumulated interest thereon were applied to reduce the net charge-off of uncollectable final bills. In an order dated May 26, 1971, regarding the increase in interest rate, the PSC stated that it had received numerous complaints and charges alleging that the utility companies used the customer deposits as a source of low-interest capital funds. In response to this, the PSC stated in its order the following: While intentional accumulation by a utility company of large sums in the customer deposit account, without regard to the original purpose for which this account is provided, would indeed constitute misuse of such funds, the use of those *502 funds made available in the normal course of business is, and has been for many years, treated by regulatory agencies as consistent with the public interest and with prudent utility management. Additionally, a blanket customer deposit policy is not intended as a substitute for the responsibility of a utility's management to protect itself diligently against unnecessary loss or to relax its efforts to collect all funds due on dilinquent accounts. There is at present no evidence before this Commission of any such violations by the utility companies involved in this proceeding. The PSC ordered that the then-current practices of utility companies relating to customer deposit accounts be changed as follows: ORDERED: that the rate of interest to be paid on deposits for utility service by applicants or customers of all electric and gas utility companies operating within the State of Georgia shall be at an annual simple interest rate of five percent (5%). Upon receipt of a cash deposit, the utility company shall furnish to the applicant for service or customer a receipt showing: (1) the date of deposit; (2) the name of the applicant or customer and the address of the premise to be served; *503 (3) the type of service to be furnished; (4) the amount of the deposit and the rate of interest to be paid thereon. Customers shall be entitled, upon application to the utility company, to receive payment for the interest accrued on their deposits at any time but not more frequently than once each year. ORDERED FURTHER: that upon discontinuance of service, the utility shall promptly and automatically refund the customers' deposits plus accrued interest or the balance, if any, in excess of the unpaid bills for service furnished by the utility. ORDERED FURTHER.9 that any customer who has received utility service at the same location for twenty-four (24) consecutive months without having had service discontinued for non-payment of a bill and who has paid his monthly utility bills promptly and regularly, and if that customer is not at the end of such 24-month period delinquent in the payment of his bills, the utility company shall, within thirty (30) days of the end of the 24-month period, automatically refund the deposit plus accrued interest. If a customer has had service discontinued for non-payment of his bill within a consecutive twenty-four-month period, the utility shall thereafter *504 review the account every twelve billings and, at the completion of a total period of twenty-four (24) months during which there has been no discontinuance of service for non-payment and during which a record of prompt and regular payment has been established, the utility shall automatically refund the deposit plus accrued interest, provided that the customer is not then delinquent in the payment of his utility bills. At the option of the utility, a deposit plus accrued interest may be refunded, in whole or in part, at any time earlier than the times hereinabove prescribed. ORDERED FURTHER: that the provisions contained in this order shall become effective on and after July 1, 1971. Georgia Power Company, Savannah Electric and Power Company, Atlanta Gas Light Company, Gas Light Company of Columbus [petitioner], and United Cities Gas Company shall file revised tariffs with this Commission not later than June 30, 1971, reflecting appropriate changes in their customer deposit policies to conform with this order. Petitions for rehearing, reconsideration, and oral argument were filed by two utility companies. The PSC granted the petitions and a rehearing was held on July 19, 1971. The *505 following points were raised by the utility companies at the rehearing: 1. There were various mechanical and procedural problems related to implementing the May 26, 1971, order by that order's effective date--July 1, 1971. 2. Automatic refunds should be allowed to be made to customers on the anniversary date of their deposits during 1972. 3. Interest should be paid on deposits only when held for six months or more. 4. The refund provision should apply only to residential customers and not to industrial and commercial customers. On reconsideration, the PSC issued another order (dated August 4, 1971) replacing the May 26, 1971, order. The August 4, 1971, order provides in pertinent part as follows: ORDER: That the rate of interest to be paid on deposits for utility service held six months or longer by applicants or customers of all electric and gas utility companies operating within the State of Georgia shall be at a simple interest rate of 5% per annum effective July 1, 1971. ORDERED FURTHER: That upon discontinuance of service, each utility shall promptly and automatically refund the customers' deposits, plus accrued interest on the balance, if any, in excess of the unpaid bills *506 for service furnished by the utility. ORDERED FURTHER: That any residential customer who received utility service at the same location for 24 consecutive months without having had service discontinued for nonpayment of a bill, and who has paid his monthly utility bills promptly and regularly, and if that customer is not, at the end of such 24-month period, delinquent in the payment of his bills, the utility company shall within 30 days of the end of the 24-month period automatically refund the deposit plus accrued interest. Provided, however, that the term "promptly and regularly" shall not be construed to disallow the refund to a customer who has had only two delinquent bills during the 24-months period. If a customer has had service discontinued for nonpayment of his bill, or has not paid his bills promptly and regularly, the utility shall withhold the refund but thereafter review the customer's account every 12 billings, and at the completion of 24 months during which there has been no discontinuance of service for nonpayment and during which a record of prompt and regular payments has been established, the utility shall automatically refund the deposit plus accrued interest, provided *507 the customer is not then delinquent in the payment of his utility bills. At the option of the utility, a deposit plus accrued interest may be refunded in whole or in part, at any time earlier than the time hereinabove prescribed, and based on any credit review period less than 24 months in the discretion of the utility. ORDERED FURTHER: This automatic refund policy shall be placed in effect by each utility no later than January 1, 1972, and refunds to entitled residential customers shall be accomplished during the anniversary month of the customers' deposits during 1972. ORDERED FURTHER: Each utility shall file within 60 days for Commission approval, proposed revisions to its Rules and Regulations for methods and procedures implementing the substantive provisions of this Order. Petitioner fully refunded a customer's deposit, plus any accrued interest, in only two situations. The first situation was when the customer established a record of 24 months of prompt payments. The full refund in this situation was required under the PSC's August 4, 1971, order. In this first situation, a full refund was made even though service continued. The second situation was when the customer terminated *508 service, while the customer deposit was being held, [10] and the customer had fully paid the final bill. Petitioner partially refunded a customer's deposit, plus any accrued interest, when the service was terminated [11] and there was an outstanding bill for services. In such a situation, petitioner applied enough of the customer deposit to cover the unpaid balance and, pursuant to the PSC's August 4, 1971, order, was required to refund any remaining amount to the customer. In a relatively small percentage of cases, a customer's deposit was not claimed. Under Georgia law, such unclaimed deposits escheat to the State of Georgia after 15 years. [12] *509 The receipts, refunds, and credits regarding petitioner's customer deposit account for taxable years 1971 through 1975, are shown in table 1: Table 1 Customer
Customer
Deposits
Customer
Customer
Deposits
Customer Deposits
Taxable
Beginning
Deposits
Deposits Refunds
Ending
Balance Increase
Year
Balance
Receipts
and Credits
Balance
or (Decrease)
1971
$229,905
$235,505
$ (218,640)
$246,770
$16,865 1972
246,770
192,720
(207,070)
232,420
(14,350)
1973
232,420
181,395
(172,305)
[13] *510 241,710
9,290 1974
241,710
167,805
(168,265)
241,250
(460)
1975
241,250
172,370
(164,740)
248,880
7,630 On its income tax returns for taxable years 1971 through 1975, petitioner reported its cost of goods sold as shown in table 2: Table 2 Cost of Goods Sold
TAXABLE YEARS
Categories Listed on
Petitioner's Tax Returns
1971
1972
1973
Cost of gas appliances
sold
$ 324,726.73
$ 430,192.87
$ 305,369.89
Natural gas purchases
5,003,407.88
5,211,836.75
4,715,705.27
Propane gas expenses
60,077.24
16,816.51
34,289.54
Other gas supply expenses
3,207.44
2,603.77
3,326.80
Other storage expenses
TOTAL
$5,391,419.29
$5,661,449.90
$5,058,691.50
Cost of Goods Sold
TAXABLE YEARS
Categories Listed on
Petitioner's Tax Returns
1974
1975
Cost of gas appliances
sold
$ 270,202.03
$ 337,388.33
Natural gas purchases
5,815,768.54
7,051,996.04
Propane gas expenses
6,044.68
1,142.40
Other gas supply expenses
2,566.28
5,625.38
Other storage expenses
75,181.59
TOTAL
$6,094,581.53
$7,471,303.74
The primary purpose of the customer deposits is prepayment for goods and services. OPINION We must decide whether petitioner's customer *511 deposits are includable in petitioner's taxable income. If we conclude they are, then we must also decide in what taxable year they are to be included and whether a change in method of accounting has occurred and has triggered an adjustment under section 481. Respondent contends that petitioner's customer deposits are includable in petitioner's income because their primary purpose was to act as a prepayment for goods and services. Respondent further contends that the taxable year of inclusion is controlled by section 1.451-5, Income Tax Regs. More specifically, respondent contends that the customer deposits are advance payments (as defined in section 1.451-5(a), Income Tax Regs.) relating to inventoriable goods and thus, "income must be recognized not later than the last day of the second year following the receipt of the advance payment" pursuant to section 1.451-5(c), Income Tax Regs. Finally, respondent contends that, if we conclude that petitioner's customer deposits are includable income rather than liabilities, as petitioner has accounted for them, then a change in method of accounting has occurred and an adjustment under section 481 is triggered. Petitioner contends that its *512 customer deposits are not includable in income. Petitioner argues that three elements in the instant case are enough "to invalidate the characterization of the customer deposits as income." Firstly, the customer deposits were required of only about two-fifths of petitioner's customers. Secondly, the customer deposits were "required only for lack of credit rating, retained * * * only until creditworthiness had been established, and applied to the payment of gas bills in a minority of cases." Thirdly, the PSC ordered the customer deposits to be refunded after a customer had established a record of 24 months of prompt payments. As to the taxable year of inclusion, petitioner contends that the customer deposits do not meet the definition of "advance payment" under section 1.451-5(a), Income Tax Regs. Finally, petitioner argues that, if we conclude that the customer deposits are includable in income, then respondent incorrectly calculated the section 481 adjustment. Petitioner argues that "none of the customer deposits on the books prior to 9/1/70 can properly be considered" in making the calculation. We agree in large part with respondent. I. Includability in Income
The Court of Appeals *513 for the Eleventh Circuit, to which an appeal in the instant case would lie, considered the issue of includability of customer deposits in income in a case factually similar to the instant case in City Gas Co. of Florida v. Commissioner,689 F.2d 943 (CA11 1982), revg. 74 T.C. 386 (1980). The Court of Appeals concluded that customer deposits to gas utility companies often serve mixed purposes--i.e., as prepayments for goods and services and also as security for the performance of nonincome-producing covenants or against property damage. City Gas Co. of Florida v. Commissioner,689 F.2d at 946. The Court of Appeals held that if the primary purpose of the payment is the former (prepayment), then the payment is includable in gross income under section 61(a); [14] *514 if the primary purpose of the payment is the latter (security), then the payment is not taxable. 689 F.2d at 946-948. Because this Court had not applied this primary purpose test (we had held that if the customer deposits were subject to refund, then they were not taxable (74 T.C. at 391)), the Court of Appeals remanded for further proceedings.
Both parties agree that the opinion of the Court of Appeals in City Gas Co. of Florida is controlling in the instant case. We agree. Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (CA10 1971). Consequently, whether the customer deposits in the instant case are includable in income depends on whether the primary purpose for the customer deposits is as prepayment for goods and services, or is as security for the performance of nonincome-producing covenants or against property damage. The following facts which we have found, supra, lead us to conclude that the primary purpose of the customer deposits is as prepayment for goods and services. [15]
1. The parties stipulated (and we have found, supra) that petitioner required the customer deposits "to insure the payment of the [customer's] final bill". 2. The document which the customer signed when making a customer deposit contained an agreement which stated, in part, that the customer *515 deposit was security for the performance of the contract of service between petitioner and the customer. The agreement further indicated that the customer deposit could be applied against the customer's account. The agreement does not mention whether the customer deposit could be applied toward property damage or any other nonincome-producing covenant. 3. Under NARUC's Uniform System of Accounts, the account for customer deposits is to include "all amounts deposited with the utility by customers as security for the payment of bills." 4. Petitioner testified before the PSC that, in fact, it did apply customer deposits to reduce the charge-off of uncollectible final bills. 5. As part of petitioner's policy of refunding customer deposits, in certain cases it applied the customer deposit toward an unpaid final bill, refunding any remainder. Petitioner contends that three factors distinguish the instant case from City Gas Co. of Florida v. Commissioner,supra. *516 Firstly, petitioner required customer deposits from only some of its customers--i.e., those without established creditworthiness--rather than from all of its customers. Secondly, the customer deposits were retained "only until creditworthiness had been established, and applied to the payment of gas bills in a minority of cases" rather than "customarily applied to the customers' final bills". Thirdly, petitioner was under order by the PSC to refund the deposits after 24 months of prompt payment (unless refunded earlier, in full or in part, when service was terminated). As we understand the Court of Appeals' opinion, customer deposits must be categorized either as prepayment for goods and services, on the one hand, or as security for the performance of nonincome-producing convenants or against property damage, on the other hand. The Court of Appeals' test does not allow for other categories. [16] *517 Thus, it is not enough for petitioner to show that the distinctions in the instant case mean that there is less than a good fit for the customer deposits in the prepayment category. Petitioner must also show that as a result of the distinctions, there is a better fit in the security category.
To begin with, based on the record in the instant case, we are unable to find that the primary purpose of the customer deposits is as security against property damage or for performance of nonincome-producing covenants. We note, for example, an absence of any mention of this possible purpose in the agreement contained in the document a customer signed upon making a deposit, as well as in the PSC order. Further, we do not see how the three distinctions petitioner points to show that the purpose of the customer deposits fit better in the nonincome-producing category rather than the income category. In fact, as to the third distinction raised by petitioner--i.e., that the customer deposits were subject to refund under order by the PSC--the Court of Appeals concluded that the *518 possibility of a refund under certain circumstances was not enough to exclude the customer deposits from income. City Gas Co. of Florida v. Commissioner,689 F.2d at 946. These distinctions do not make a difference. Petitioner contends that it treats the customer deposits as liabilities on its books, pursuant to the NARUC Uniform System of Accounts, and that this is inconsistent with taxing the customer deposits as income. The Court of Appeals of the Eleventh Circuit specifically rejected this argument in City Gas Co. of Florida v. Commissioner,689 F.2d at 949, and we are bound by this rejection. Petitioner contends that the customer deposits, even if they are advance payments, are not income so long as petitioner's right to retain them is contingent. The Court of Appeals for the Eleventh Circuit specifically rejected this argument in City Gas Co. of Florida v. Commissioner,689 F.2d at 949-950, and we are bound by this rejection. We conclude that the primary purpose of the customer deposits was securing prepayment for goods and services; thus, the customer deposits are includable in petitioner's income. We hold for respondent on this issue. II. Year of Inclusion
We have held *519 that the customer deposits are includable in petitioner's gross income. Under section 451(a), [17] the customer deposits received during a year are includable in petitioner's income for that year, unless, under petitioner's method of accounting, the customer deposits are "to be properly accounted for as of a different period." Respondent contends that the customer deposits are advance payments (as defined in section 1.451-5(a), Income Tax Regs.), relating to inventoriable goods and, as such, are includable in income not later than the second year following the year of receipt of these customer deposits, under section 1.451-5(c), Income Tax Regs.
Petitioner maintains that the customer deposits do not meet the definition of advance payments under the regulation. [18] Petitioner does not, however, suggest when the customer deposits are includable *520 in income if we conclude that they are not advance payments under section 1.451-5, Income Tax Regs. (Respondent states that, if we were to agree with petitioner that the regulation does not apply, then "it is respondent's position that case law and legislative history mandate the inclusion of the advance payments in income in the year of receipt.") The definition of advance payments, under section 1.451-5(a), Income Tax Regs., [19] *521 consists of three parts. Firstly, the payment must be an amount received "pursuant to" an agreement for sale or other disposition in the future of goods. Secondly, the payment is "to be applied against" such agreement. Thirdly, the goods which are the subject of the agreement, must be "goods held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". We consider these requirements seriatim. Firstly, in substance the customer deposits were looked to as payment for any unpaid final bill for the sale and purchase of gas under the agreement between petitioner and the customers. As we found, supra, petitioner's representatives testified to this effect before the PSC and petitioner's refund policy reflected this. Thus, in substance *522 the customer deposits were received "pursuant to" the basic agreement to sell and purchase gas. Petitioner states that the customer deposit "by its terms is merely security for the performance of the first agreement" (the "basic agreement for the sale and purchase of gas"). We have already held that the customer deposit served primarily as a prepayment for goods and services. These are the goods and services that petitioner is selling to its customers. Petitioner's insertion of the term "security" in the customer deposit agreement does not change the substance of the customer deposit's role in petitioner's agreement to furnish goods and services. See City Gas Co. of Florida v. Commissioner,689 F.2d at 948 n. 7. Petitioner also contends that the "pursuant to" requirement of the regulation is not met because the customer deposit is not required of all its customers. We see nothing in the regulation suggesting that a payment is not an advance payment unless it is required of all customers. We conclude that this first part of the regulation's definition of advance payment is satisfied. Secondly, under both the PSC August 4, 1971, order and petitioner's refund policy, customer deposits *523 could be applied to unpaid bills for the sale and purchase of gas. It was more than just "a mutually covenient way of closing out the account", as petitioner contends. In fact, as we have found, supra, petitioner's representative testified before the PSC that the customer deposits were looked to for reducing the charge-off of uncollectible final bills. Petitioner's freedom to apply the customer deposits to unpaid bills, petitioner's policy to so apply the customer deposits, and petitioner's actual application of the customer deposits lead us to conclude that the second part of the regulation's definition of advance payments is satisfied. Thirdly, the parties have stipulated (and we have found) that petitioner's primary business was "the acquisition, distribution, and sale of natural gas to * * * customers". On its income tax returns for each of the years in issue, petitioner reported costs of goods sold and each year substantially all (upwards of 92 percent) was described by petitioner as "Natural gas purchases". (See table 2, supra.) Petitioner contends that "goods" means only "goods on the taxpayer's shelves or in his warehouse or to be manufactured by the taxpayer or by someone *524 else and sold through the taxpayer to the customer in the future, as in Example 2 under Reg. § 1.451-5(b)(2). It is generally recognized that Reg. § 1.451-5 sprang from Hagen Advertising Displays, Inc. v. Commissioner407 F.2d 1105 (6th Cir. 1969) and similar cases dealing with hard goods. * * * Moreover, petitioner never has the gas in its inventory: The gas is received from petitioner's pipeline supplier and simultaneously delivered to its customers, remaining in petitioner's mains only for the brief time it takes to pass from the pipeline to the consumer's house or place of business." Firstly, the language of the regulation is not so limited. Secondly, although Hagen Advertising Displays, Inc. v. Commissioner,407 F.2d 1105 (CA6 1969), affg. 47 T.C. 139 (1966), involved manufactured goods, nothing in either the Court of Appeals' opinion or our opinion in that case suggests that a definition of advance payments should be limited to the definition of goods for which petitioner contends. Thirdly, the example which petitioner relies on is inapposite to the point it is trying to make. Section 1.451-5(b), Income Tax Regs., deals with the taxable year of inclusion of advance payments. *525 Example 2 describes when a manufacturer of certain goods must include advance payments in income under a specific set of circumstances. It is not an example of, and does not limit, the definition of advance payments. Finally, insofar as petitioner is suggesting that "goods" means goods which are usually the type thought to constitute inventory, we note that natural gas which is transmitted through pipelines is considered to become inventory when it enters the pipeline, and not merely when it enters the pipeline company's storage facility. See Northern Natural Gas Co. v. Commissioner,44 T.C. 74, 77-79 (1965), affd. 362 F.2d 781 (CA8 1966). Also, we note that petitioner's senior vice president testified that, in 1973, petitioner's gas mains had from 2,251 MCF to 1,861 MCF (i.e., from 2,251,000 cubic feet to 1,861,000 cubic feet) of gas, depending on the pressure that the gas was subjected to. In addition, the parties stipulated that, during its taxable year 1974, petitioner constructed and placed in service a new liquid natural gas facility which was used to liquify and store excess supplies of natural gas during periods of low consumption, and vaporize the gas during periods *526 of high consumption. Petitioner spent about $4.7 million on this facility. We conclude that the third part of the definition is satisfied and, thus, the customer deposits in the instant case constitute advance payments for purposes of section 1.451-5, Income Tax Regs.
Respondent, in the notice of deficiency, determined that the customer deposits were advance payments for inventoriable goods and so qualified for the limited deferral from inclusion in income provided under section 1.451-5(c), Income Tax Regs. Under this rule, the customer deposits must be included in income no later than the last day of the second taxable year following the year in which substantial advance payments are received. Respondent determined that under this rule, income from customer deposits was includable as income in fiscal years 1973 and thereafter. Petitioner contends that if we conclude that respondent is correct as to the taxable year of inclusion, then because of petitioner's refund policy "we would be presented with the anomolous [sic] situation that * * * petitioner would be required to report as income money which it had already refunded to its customers." (Emphasis in original.) The problem to *527 which petitioner adverts does not appear to be present in the instant case, since in the notice of deficiency respondent used net figures in calculating the amounts of customer deposits includable in income under section 1.451-5(c), Income Tax Regs. That is, respondent has already accounted for the refunds of customer deposits. [20] We hold for respondent on this issue. III. Change in Method of Accounting; Section 481 Adjustment
Respondent contends that his "change in petitioner's treatment of customer deposits constitutes a change in petitioner's method of accounting, requiring adjustments pursuant to I.R.C. § 481." Respondent, in the notice of deficiency, determined that the change in methods of accounting occurred in taxable year 1973 [21] and made an adjustment under section 481, for the period beginning *528 September 1, 1953, and ending August 31, 1972. Petitioner does not contest (and thus, apparently concedes), that if we conclude (as we have), that the customer deposits are includable in income as advance payments, then a change in petitioner's method of accounting occurred and an adjustment under section 481 is required. Rather, petitioner's only contention is that respondent incorrectly *529 calculated the amount of the adjustment required under section 481. Petitioner argues that respondent, in making his calculation: totally overlooked the nature of the customer deposits as individual transactions. Pursuant to the order of [PSC], on or immediately following January 1, 1972, petitioner refunded all deposits to customers having satisfactory payment records for more than 24 months, and continued such refunds through the remainder of FYE 8/31/72. Thus, with the negligible exception of deposits of customers with unsatisfactory payment records, no deposit on hand on 8/31/72 had been held by the [petitioner] for more than 24 months, i.e. since September 1, 1970. Petitioner earnestly maintains that the customer deposits are not advance payments at all; but if they should be held to be income, none of the customer deposits on the books prior to 9/1/70 can properly be considered, and the most that should be found to be attributable to the deposits on hand on 8/31/72 would be the excess of the $232,420 on hand at 8/31/72 over the balance on September 1, 1970 of $229,905. [See table 1, supra.] We agree essentially with respondent. Section 481(a)[22] requires that adjustments *530 be made to the extent necessary to avoid double-counting or omissions when a taxpayer's method of accounting is changed. To calculate the section 481 adjustment, respondent in essence subtracted the opening balance of the customer deposit account in an earlier year (petitioner's taxable year 1954) [23] *532 from the ending balance of the account in the year before the year of change in method of accounting *531 (taxable year 1972) and adjusted the difference for the cost of the gas to arrive at a net adjustment. Respondent then made the same sort of calculation using the opening and closing balances in the year of change (taxable year 1973) and added that adjustment to the 1954-1972 adjustment. The ending balance of the account is calculated by taking the opening balance of the account for the particular year, adding to it the customer deposits received and subtracting from it the customer deposits refunded or credited to customers. (See table 1, supra.) Respondent's approach to calculating the section 481 adjustment is the equivalent of adding up all the amounts of customer deposits received for the period from the beginning year through taxable year 1973, and adding up all the amounts of the customer deposits refunded or credited during the same period, and then subtracting the total customer deposits refunded or credited from the total customer deposits received. Thus, respondent's method of calculating the section 481 adjustments takes into account any refunds, required to be made by the PSC because a customer had a record of prompt payment for 24 months, which were actually made. Petitioner's detailed approach would have the effect of allowing petitioner to deduct the September 1, 1970, customer deposit balance of $229,905 even though petitioner had never taken these customer deposits into account on either an individual or net basis. If petitioner's general approach were correct, then the entire August 31, 1972, customer deposit balance of $232,420 should be taken into account in petitioner's taxable year 1973, since all of this amount was still on hand at the beginning of this taxable year and none of this amount had previously been taken into income. Section 481 is designed to reduce the dislocative effect of correcting accounting method errors, without permitting taxpayers to improperly avoid forever taxation of amounts that had escaped earlier taxation because of the taxpayers' methods of accounting. Pursell v. Commissioner,38 T.C. 263, 271 (1962), affd. 315 F.2d 629 (CA3 1963). We are satisfied that respondent's approach correctly applies both the law and the policy. We do have one problem, however, with respondent's *533 calculation--the year respondent used for purposes of the opening balance. If a change in method of accounting is initiated by respondent, rather than initiated by the taxpayer, then the last clause of section 481(a)(2) (in combination with section 7851(a)(1)(A)) forbids respondent to take into account adjustments "based on amounts which were taken into account in computing income (or which should have been taken into account had the new method of accounting been used) for taxable years beginning before January 1, 1954, or ending before August 17, 1954." Section 1.481-1(a)(2), Income Tax Regs. The opening balance used by respondent was as of September 1, 1953, which was the beginning of petitioner's fiscal 1954 year. Under the regulation, however, petitioner's first taxable year which did not begin before January 1, 1954, or end before August 17, 1954, is taxable year 1955, which began September 1, 1954. Thus, the opening balance which respondent should have used was the opening balance as of September 1, 1954, and not as of September 1, 1953 (see n. 23, supra). We direct the parties to address this matter in the Rule 155 computation. We hold for respondent on this issue, with *534 the above-described modification. [24] To reflect the foregoing and the settlement of other issues, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all references to taxable years are to petitioner's fiscal years ending August 31.↩
2. The amount of petitioner's allowable net operating loss carryback from taxable year 1974 to taxable year 1971 depends both on the issue for decision and on the settled issues. 3. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
4. So stipulated. The parties have not enlightened us as to what differences there are between petitioner's books and petitioner's books of accounts. ↩
5. This organization is now known as the National Association of Regulatory Utility Commissioners. ↩
6. This organization is now known as the Federal Energy Regulatory Commission.↩
7. A customer who wanted to establish a credit record with petitioner could give petitioner credit information which petitioner would then check. If a credit record was established, then the customer could obtain service without making a customer deposit.
8. Petitioner has required customer deposits at least as far back as its taxable year 1953. Originally, the amount required was $5. By 1968, the amount had risen to $15. By 1970, the amount had risen to $20.↩
9. This phrase is printed in slightly larger and slightly bolder capital letters.↩
10. A customer's deposit was held as long as the customer had not established a record of 24 months of prompt payment.↩
11. Service might be terminated either voluntarily by the customer (e.g., when the customer moved) or involuntarily by petitioner (e.g., when there was a bad payment record and collection efforts were unsuccessful).↩
12. The parties do not explain, and the record does not show, when this 15-year period begins to run, nor does the record show whether any such escheats were properly accrued during any of the years in issue. If this matter affects the amount of any deficiency for any of these years, then the parties are to resolve this matter as part of the computation under Rule 155. Unless indicated otherwise, all rule references are to the Tax Court Rules of Practice & Procedure.↩
13. So stipulated. Since the taxable year 1973 beginning balance ($232,420) plus the receipts ($181,395) less the refunds and credits ($172,305) equal $241,510--$200 less than the stipulated ending balance--it is evident that there is an error. The record in the instant case does not enable us to determine whether the error lies in the receipts amount, the refunds and credits amount, or the ending balance amount. (If the error is in the ending balance amount, then the balance increase for the year would be $9,090.) This discrepancy does not affect our analysis, infra.↩ The parties are directed to resolve this matter as part of the computation under Rule 155.
14. Section 61(a) provides, in relevant part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (2) Gross income derived from business;↩
15. As to the significance of petitioner's commingling of the customer deposit funds with its other funds, and petitioner's unrestricted use of the customer deposit funds, see City Gas Co. of Florida v. Commissioner,689 F.2d 943, 948↩ n. 7 (CA11 1982).
16. See City Gas Company of Florida v. Commissioner,T.C. Memo. 1984-44 (47 T.C.M. 971↩, 973, 53 P-H T.C. Memo par. 84,044).
17. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule.--The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.↩
18. Petitioner does not challenge the validity of the regulation and we see no basis for doing so in the instant case. See, e.g., Bingler v. Johnson,394 U.S. 741, 750↩ (1969).
19. Section 1.451-5(a), Income Tax Regs., provides, in relevant part, as follows: Section 1.451-5. Advance payments for goods and long term contracts. (a) Advance payment defined. (1) For purposes of this section, the term "advance payment" means any amount which is received in a taxable year by a taxpayer using an accrual method of accounting for purchases and sales * * * pursuant to, and to be applied against, an agreement: (i) For the sale or other disposition in a future taxable year of goods held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * * (2) For purposes of subparagraph (1) of this paragraph: (i) The term "agreement" includes * * * (b) an agreement which obligates a taxpayer to perform activities described in subparagraph (1)(i) * * * of this paragraph and which also contains an obligation to perform services that are to be performed as an integral part of such activities; and (ii) Amounts due and payable are considered "received".↩
20. The amounts used by respondent were the ending balances of the customer deposits accounts. (See table 1, supra.↩) The ending balance figure is calculated by taking the opening balance of the customer deposits, adding to it the amounts of customer deposits received during the fiscal year, and subtracting from it the amounts of customer deposits refunded or credited to customers.
21. Respondent determined that the first year for which petitioner did not correctly report the customer deposits as advance payments (and for which the statute of limitations period evidently has not run) was taxable year 1971. Under section 1.451-5(c), Income Tax Regs., however, the first year that petitioner's taxable income was changed was taxable year 1973, because of the 2-year deferral rule. The year of the change in the taxpayer's method of accounting is defined as "the taxable year for which the taxable income of the taxpayer is computed under a method of accounting different from that used for the preceding year." Section 1.481-1(a)(1), Income Tax Reg.↩ (emphasis added). Accordingly, in the instant case the year of change is taxable year 1973 (not 1971)--which is what respondent determined.
22. SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING. (a) General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")-- (1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then (2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.↩
23. The opening balance that respondent used in the notice of deficiency was as of September 1, 1953, or the beginning of petitioner's taxable year 1954.
24. Petitioner has not claimed the benefits of the ameliorative provisions of subsections (b) and (c) of section 481↩, and so we do not address the applicability of these provisions.