**INDIANAPOLIS POWER & LIGHT COMPANY, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 87–2438.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1988.

Decided Sept. 20, 1988.

William A. Whitledge, Michael L. Paup, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for appellant.

Larry J. Stroble, Barnes & Thornburg, Indianapolis, Ind., for appellee.

Before BAUER, Chief Judge, and FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

The Internal Revenue Service ("IRS") assessed deficiencies against Indianapolis Power & Light Company ("IPL") for the tax years 1974–77, arguing that deposits IPL required certain customers to make in order to receive electrical services were advance payments for tax purposes that should have been included in gross income in the year IPL received them. IPL contested the deficiencies. The Tax Court ruled that the sums were security deposits and that IPL therefore properly excluded them from gross income. We affirm.[1]

I.

IPL generates and sells electricity in Indianapolis and neighboring areas of Indiana. It is an Indiana public utility and is therefore subject to the Rules and Regulations of Service for Electrical Utilities in Indiana ("the Rules of Service") promulgated by the Public Service Commission of Indiana ("PSCI"). During the years in question, approximately 5% of IPL's customers were required under the Rules of Service to make deposits. The receipts issued to these customers stated in part that the deposits were "to insure prompt payment" for the electrical service IPL was to provide.[2] The customers to whom this requirement applied were identified by a credit test. If a customer who was initially required to make a deposit later demonstrated creditworthiness, the deposit was refunded.

The specific rules governing the administration of this deposit program were amended on March 10, 1976. Prior to this amendment, IPL administered the deposit requirement on a case-by-case basis. A credit test was employed, but there were no fixed financial rules for making the creditworthiness determination. Once a customer was required to make a deposit, the customer could only obtain a refund by specifically requesting a review and then affirmatively demonstrating his or her creditworthiness. The amount of the deposit was equal to twice the customer's estimated monthly bill and IPL paid interest at an annual rate of 3% on sums held at least six months. The interest was paid at the time the deposit was refunded or alternatively, if the customer requested, annually. The manner of the refund, either by cash, check, or an offset against the customer's electric bill, was determined by the customer.

The 1976 amendments were largely designed to minimize the arbitrariness that was perceived to exist under the prior rules. Under the revised rules, IPL was required to evaluate the creditworthiness

---

1. Amicus curiae briefs were filed by Commonwealth Edison Company and by American Telephone and Telegraph Company. AT & T's brief was filed jointly with a group of divested Bell Telephone subsidiaries collectively referred to as "the Regional Holding Companies."

2. The charge for electrical service was usually the largest item on a customer's utility bill, but charges for disconnection, reconnection, late payments, returned checks, and meter tampering were also possible.

of all new residential applicants and existing residential customers. IPL required deposits from those new customers who failed the credit test furnished by PSCI and also from existing customers who had a history of late payment. Commercial customers continued to be evaluated on a case-by-case basis.

Under the amended rules, IPL refunded a customer's deposit if the customer paid his or her electric bill on a timely basis for nine straight months or for ten out of twelve months (as long as the two delinquent months were not consecutive). Alternatively, the customer could obtain a refund by later satisfying the credit test. Deposits refunded on either of these two grounds were made in cash or by check, unless the customer requested that the amount of the deposit be offset against his or her bill. On the other hand, refunds resulting from the termination of service were generally made by offsetting the deposit amount against the customer's final electric bill, unless the customer specifically requested otherwise. Customers whose deposits were held by IPL for at least 12 months were paid interest at 6% annually. Information about the deposit requirement and corresponding refunds was set forth in a pamphlet which IPL was required to provide to its customers.

The customer deposits IPL received were not segregated from its other assets in any manner, but rather IPL used them in the ordinary course of its business. IPL was an accrual basis taxpayer for the years in question and treated the deposits as current liabilities at the time they were received.[3] If the deposit was later used to offset a customer's bill, IPL made the nec-

essary accounting adjustments at that time. Unclaimed deposits escheated to the state.

## II.

### A.

The issue raised by this appeal is whether IPL should have included the customer deposits in gross income in the year of receipt (with a corresponding loss when refunded) rather than recording them as a current liability.[4] This in turn hinges on the legal standard a court should utilize when evaluating the taxability of customer deposits. The IRS argues that the proper test for determining the tax consequences of these types of deposits is set forth in *City Gas Co. of Florida v. Commissioner,* 689 F.2d 943 (11th Cir.1982).

The facts in *City Gas* are very similar to those in the present case. New customers of the City Gas Company and two of its subsidiaries were required to make deposits to secure the payment of all bills for service rendered to them. All three of the companies mingled the deposits they received with their other corporate funds. City Gas, but not its two subsidiaries, paid interest to its customers on their deposits at 4% annually. When a customer discontinued service the companies refunded the deposit by either crediting the amount against the customer's final bill or by sending the customer a check.

The Tax Court in *City Gas* ruled that these customer deposits were not taxable when received by the three companies. The Eleventh Circuit reversed, ruling that the proper test is to look at the primary purpose of the deposit. If its primary pur-

---

**3.** The Rules of Service required IPL to treat these deposits as current liabilities for regulatory accounting purposes. Ind.Admin.Rules and Regs.Tit. 8, r. (8–1–2–10)–C11 (Burns Supp. 1978).

**4.** The consequence of the IRS's assessment to IPL is technically one of timing, but in practical terms may result in a one-time tax on IPL's customer deposit base. Under the IRS's position, IPL would be required to include its entire deposit base in gross income in 1974, and then any incremental increase or decrease would represent additional income or loss in each of

its following tax years. If the deposit base increased, the amount of this additional increase would be included in gross income. If the total dollar value of refunds exceeded the amount of additional deposits, IPL would report a loss for tax purposes. Because the amount of IPL's deposit base grew in 1975, 1976, and 1977, the IRS assessed deficiencies for these years. Assuming that IPL's deposit base does not shrink in the near future, the loss corresponding to a refund will be of a substantially lower value in terms of dollars adjusted for the time value of money.

pose is to secure the future payment for goods or services to be provided by the deposit recipient, then it is taxable upon receipt in the same manner as an advance payment of income. *City Gas*, 689 F.2d at 946, 948 n. 7. On the other hand, if the deposit is designed to cover any damage to property in the possession of the depositor, but owned by the deposit recipient, or to secure the performance of other non-income provisions of a contract ("non-income covenants"), it is not considered an advance payment. *Id.* Because it is undisputed that the purpose of the deposits received by IPL was to secure the payment of their customer's electric bill, an income item, the IRS asserts that IPL should have included the deposits in gross income when it received them.

A unanimous Tax Court declined to apply the Eleventh Circuit's *City Gas* test in this case. *Indianapolis Power & Light Co. v. Commissioner*, 88 T.C. 964 (1987). Rather, the Tax Court adhered to its own prior decision in *City Gas* and held that the proper approach is to determine whether in the facts and circumstances of the case, the customer deposit serves as an advance payment of income or as security for future performance.[5] In the Tax Court's view, this determination is made by comparing the rights retained by the depositor with the rights acquired by the depositee. If the deposit is to serve as security, it is properly excluded from income, regardless of whether the future performance it secures is the payment of income for services to customers or merely non-income covenants such as protecting against damage to property.

Employing this test, the Tax Court ruled that the customer deposits held by IPL were properly excluded from IPL's gross income. The Tax Court primarily relied on three factors. First, only five percent of the customers were required to make deposits. The Tax Court reasoned that if the deposits were really intended to serve as an advance payment, IPL would have required

such deposits from all of its customers. Second, although IPL had discretion as to how to use the deposits it held, the customers controlled the timing and the disposition of the deposit. Prior to 1976 a customer could request a reevaluation of his or her creditworthiness and after 1976 a customer's timely payment of his or her bill for nine consecutive months led to an automatic refund. IPL paid between 30% and 40% of its refunds by check; it handled the remainder by offsetting the deposit amount against the customer's bill. Third, IPL paid interest on the deposits.

■ The proper legal test for a court to apply in determining the appropriate tax treatment of deposits such as those received by IPL is a question of law which we review de novo. IPL's intentions and purposes in requiring customers to make these deposits, however, are questions of fact which we review under a clearly erroneous standard. *Busch v. Commissioner*, 728 F.2d 945 (7th Cir.1984).

**B.**

■ We begin with the two baseline rules with which both parties agree. First, a deposit given to secure a non-income covenant is non-taxable to the deposit recipient. Gross income is defined to include all income from whatever source. 26 U.S.C. § 61. A deposit to secure tangible property, however, is not considered income because it is offset by an obligation to refund the deposit if the property being used by the depositor is returned to the deposit recipient undamaged. Frequently the deposit recipient has unrestricted use of the deposit during this time period. Despite this discretion, the deposit recipient is not required to include the deposit in gross income because he or she is not considered to have "gained" for tax purposes. *Clinton Hotel Realty Corp. v. Commissioner*, 128 F.2d 968, 969 (5th Cir.1942); *J. & E. Enterprises, Inc. v. Commissioner*, 26

---

**5.** The Tax Court also declined to follow the Eleventh Circuit's *City Gas* test in *American Telephone and Telegraph Co. v. Commissioner*, 55 T.C.M. 16 (1988). The Tax Court did apply the *City Gas* test in *Gas Light Co. of Columbus v. Commissioner*, 51 T.C.M. 685 (1986), but that case was appealable to the Eleventh Circuit.

T.C.M. 944, 946 (1967). *See also Illinois Power Co. v. Commissioner*, 792 F.2d 683, 689 (7th Cir.1986) ("taxpayer is allowed to exclude from his income money received under an unequivocal contractual, statutory, or regulatory duty to repay it, so that he is really just the custodian of the money."). In this respect, the deposit recipient's situation is analogous to the typical cash loan. The borrower does not include the loan proceeds in gross income because he or she also incurs an obligation to repay the money. *Commissioner v. Tufts*, 461 U.S. 300, 319, 103 S.Ct. 1826, 1837, 75 L.Ed. 2d 863 (1983).

■ The second proposition with which both parties agree is that "advance payments" must generally be included in gross income by the recipient when received, even if the recipient uses an accrual basis of accounting for tax purposes. Perhaps the best example of an advance payment is a lease that requires the lessee to pay a sum equal to one period's rent at the start of the lease term which is to be applied to the payment of the last period's rent. In this situation, the amount of the advance is taxable income to the lessor at the time of receipt, rather than when it is "earned" for accrual accounting purposes in the last term of the lease. *See, e.g., Astor Holding Co. v. Commissioner*, 135 F.2d 47 (5th Cir.1943) (partial payment of tenth year's rent up front was prepayment of rent and taxable to the lessor upon receipt). The traditional justification for this result is that from the moment of receipt the lessor can "use the advance payment as its own money." *Id.* at 48. Courts have characterized sums paid at the outset of a contract as advance payments even when the recipient is contractually obligated to return the money if some remote contingency occurs. *See, e.g., Van Wagoner v. United States*, 368 F.2d 95 (5th Cir.1966) ("deposit premium" received by insurance agent taxable upon receipt even though agent required to return the amount if the policy was can-

celled); *Hirsch Improvement Co. v. Commissioner*, 143 F.2d 912 (2nd Cir.), *cert. denied*, 323 U.S. 750, 65 S.Ct. 84, 89 L.Ed. 601 (1944) (lessor required to return an amount to be applied to the last year's rent if the leased premises destroyed prior to the expiration of the lease). This result is justified on the grounds that the possibility that the lessor would have to repay the sum is too unlikely to prevent the sum from being characterized as an advance payment of rent. *See, e.g., Hirsch*, 149 F.2d at 915. *See also Illinois Power*, 792 F.2d at 690 ("usually the court just asks how likely is repayment, and if the answer is, not very, the receipt is treated as income").

After carefully reviewing the prior case law, the Eleventh Circuit concluded in *City Gas* that the proper test for distinguishing security deposits from advance payments "is whether, under all the circumstances, the primary purpose of the payments at issue was a prepayment of income items, or whether the primary purpose was to secure the performance of nonincome-producing covenants." 689 F.2d at 948 (footnote omitted). In stating the test in this manner, the Eleventh Circuit implicitly assumed that a deposit to secure the payment of an income item is the same as the prepayment of that income item.[6] Under this test, a sum given primarily to secure the performance of an income producing covenant is taxed as an advance payment. Underlying this view is the recognition that in terms of the recipient's cash flow, deposits to secure income items and advance payments are essentially the same.

This point is demonstrated by comparing a prepayment of rent with a deposit to secure the payment of rent. In each instance, assuming the lessee does not default, the lessor receives the sum up front and has discretion over the use of the money during the lease term. The fundamental distinction between these two cases is that in the deposit situation the lessor has

---

**6.** On remand, for example, the Tax Court observed that under the *City Gas* test "deposits must be categorized either as prepayments for goods and services on the one hand, or as security for the performance of non-income-produc-

ing covenants on the other. The Eleventh Circuit, as we understand it, did not admit to the possibility of other categories." *City Gas Co. of Florida v. Commissioner*, 47 T.C.M. 971, 973 (1984) (footnote omitted).

a legal obligation to return the amount of the deposit when the lessee makes the final rent payment. In practical terms, however, this is just an exchange of checks. The lessee pays the last month's rent and the lessor returns the deposit; these payments offset each other. In each case, the lessor receives his or her rent on a timely basis and has "the use" of the deposit amount from the start of the lease until the final rent payment is made. The situations are also similar if the lessee defaults. A lessor who receives either an advance payment or a rent deposit is entitled to the remaining rent payments under the lease and uses the deposit/advance to satisfy one of these remaining payments.[7]

The functional similarity between an advance payment of rent and a deposit to secure the payment of rent suggests that they should be taxed similarly. The crux of this position is that the importance of the unconditional obligation to return the deposit amount should not control for tax purposes because the deposit recipient had the use of the deposit amount for the same time period as if the sum received was undisputably an advance payment of rent;

the return of the deposit amount is of no consequence because it is offset by the final month's rent payment. In its simplest terms, the IRS's argument is that deposits to secure rent must be taxed the same as advance payments because otherwise lessors desiring the non-tax advantages associated with advance payments could obtain them and at the same time avoid the resulting adverse tax consequences by structuring the deal as a deposit. In the IRS's view, this result cannot be justified because from the perspective of the parties there is no functional difference between the two arrangements. Accordingly, the IRS advocates that we adopt the Eleventh Circuit's primary purpose test.[8]

■ Although we believe that the proper approach to determining the appropriate tax treatment of a customer deposit is to look at the primary purpose of the deposit based on all the facts and circumstances, we conclude that the application of this test does not require a finding that a deposit to secure an income payment must always be taxed as an advance payment.[9] In order to

7. We note that the lessee would presumably have the same status for bankruptcy purposes should the lessor go bankrupt regardless of whether a payment was classified as an advance payment, a deposit to secure income, or a deposit to secure property.

8. The IRS also quotes Justice Brandeis' famous statement setting forth "The Claim of Right Doctrine":

> If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.

*North American Oil Consol. v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932). As we stated in *Illinois Power,* "whether the money is received 'under a claim of right'—is often a conclusion rather than a criterion; it is so in this case." 792 F.2d at 688.

9. We note that by overlooking the lessor's legal obligations and focusing on "the economic substance of the transaction," Appellant's Br. at 19, the IRS fails in our view to persuasively explain why deposits to secure income should be treated differently from deposits to secure property that are given in conjunction with a contractual ar-

rangement that generates an income stream (which the IRS concedes should not be included in a taxpayer's gross income upon receipt). A lessor who requires a deposit to secure against damage to leased property also has use of the deposit amount during the lease term. If no damage occurs, the money is returned to the lessee. Assuming rent is paid at the end of the month, the exchange of checks will probably be no less contemporaneous than it is with a deposit to secure the payment of rent (if the rent is paid at the beginning of the month the lessor actually has the use of the lessee's deposit money for one more month than if it secured only the rent payment). If the property is damaged by the lessee, the deposit is applied to the cost of repairs. In either case, however, the lessor holds the sum, usually with total discretion as to its use, during the period the property is in the lessee's possession. In terms of cash flow to the lessor, a deposit to secure property is at least as advantageous as a deposit to secure the payment of rent.

The IRS asserts that the two situations are distinguishable because a deposit to secure property "generally will not give rise to income, even if ultimately retained by the taxpayer." *Id.* at 18 n. 10. The IRS reasons that any property damage incurred by the deposit recipient, if deductible as a loss, would be offset by the application of the deposit. *Id.* (We suspect that

explain our position, we re-examine the rationale for the tax-treatment of advance payments. As previously noted, the traditional explanation for requiring recipients to include advance payments in income upon receipt is that the recipient can "use the advance payment as its own." *Astor Holding Co.*, 135 F.2d at 48. In this case IPL had discretion over the disposition of its customers' deposits, but was legally required to "refund" the deposit if a customer established creditworthiness and was also required to pay interest in the interim. The critical issue therefore is what does "the use" of the proceeds mean and in what circumstances is it taxed.

There are two principal reasons why having the use of a sum of money, either as a deposit or an advance payment, is valuable to the recipient. First, until the sum is returned to the depositor, or in the case of an advance payment, until it is formally applied to satisfy the obligation that will accrue, it can be used by the recipient to generate a return ("the return factor"). In the simplest case, this would be the interest the recipient could earn by putting the sum in a savings account. Second, if the money is received up-front, the recipient is saved at least a portion of the costs that

arise if the other party to the contract should later default ("the security factor"). In the case of a deposit to secure the payment of rent, if the lessee fails to make a rent payment the lessor is able to apply the deposit to satisfy the missed payment and is perhaps spared the legal expense and other costs associated with collecting from the defaulting lessee.[10] In practical terms, an advance payment of rent operates in the same way. This is also true with deposits given to secure the deposit recipient's property. The deposit recipient can use the deposit to offset the cost of repairing any damage to the property and thereby avoid the difficulty of locating and collecting from the breaching party.

If, however, the deposit recipient pays interest to the depositor, at least a portion of the return factor's value is lost because the return that is generated is offset by the interest paid. The deposit recipient may still benefit from possessing the deposit if the return he or she is able to make from the deposit exceeds the interest rate paid to the depositor, but this is also true of the typical loan and does not make the loan proceeds taxable to the borrower upon receipt. Accordingly, when a reasonable rate of interest is paid on a deposit, the value of

the deposit recipient's gain or loss would be determined by comparing the amount of the deposit applied to repair or replace the damaged property with the deposit recipient's basis in the property). In contrast, the IRS argues, the use of a deposit to secure rent to satisfy a missed rent payment is accompanied by the recognition of rent revenue. But for an accrual basis taxpayer, the rent revenue arises from the lessee's use of the leased property and is recognized independently of whether there is a deposit to secure its payment or not. If there is no such deposit, the taxpayer still recognizes rent revenue but debits "rent receivable" instead of "deposit to secure rent."

The IRS's argument, relying on revenue recognition principles, seems inconsistent with its position on the appropriate tax treatment of deposits to secure income which does not respect the taxpayer's accrual accounting system. The IRS argues that a deposit to secure income should be taxed upon receipt rather than when the rent revenue accrues. The lessor, however, typically has no rights in this type of deposit until the lessee defaults. In essence the IRS justifies taxing an income deposit upon receipt because the sum is available at the outset and the parties contemplate that it can be used to

satisfy the lessee's obligations that will accrue under the lease. But when a lessor holds a deposit to secure property and the lessee defaults on a rent payment, although the lessor may not be able to apply the deposit to directly cover the rent as would be the case with a deposit to secure the payment of rent, in practical terms the lessor will retain the deposit and apply it to satisfy a judgment relating to the lessee's nonpayment under the lease. The lessor therefore never divests the deposit amount in either case. Thus, once one focuses on "economic substance," the distinction between a deposit to secure income and a deposit to secure property is not so clear and it is less apparent why a deposit to secure income should be taxed as an advance payment rather than as a deposit to secure property.

10. This may be true even where the lessee breaches very early in the lease term. In *Clinton Hotel*, 128 F.2d 968, for example, the lessor received a sum equal to one year's rent on a ten year lease at the outset. A payment such as this affords the lessor time in which to possibly re-rent the property to another party for the remainder of the lease term and thereby mitigate his or her exposure to the lessee's default.

the deposit to the depositee may relate predominantly to the "security factor," which comports more squarely with the common sense definition of a security deposit.

Assume for example that IPL was required by an agreement with its depositors to keep the deposits in its general corporate savings account (although commingled with IPL's other savings) and to pay the depositors the same rate of interest that it received from the bank. In this situation presumably the only benefit IPL receives from holding the deposits is the security afforded in case a customer fails to pay its bill; the return factor has been negated. Although the recipient is assured that a customer's outstanding bill will be paid, this benefit alone in our view does not constitute "the use" of the proceeds in a manner sufficient to justify immediate taxation of the deposit. The deposit merely assures that IPL will be paid and minimizes the collection costs IPL would otherwise incur if the depositor defaults, functions typically associated with security deposits. In contrast, in common parlance an advance payment means "getting the money upfront." The recipient is required to include the sum in income when he or she receives the payment because typically the entire return generated during the interim will accrue to the recipient without an offsetting interest payment.[11]

We recognize that we have postulated an extreme case, but the point is that as the interest rate paid on a deposit to secure income begins to approximate the return that the recipient would be expected to make from "the use" of the deposit amount, the deposit begins to serve purposes that comport more squarely with a security deposit. We therefore hold that deposits to secure the payment of an in-

---

**11.** We recognize that perhaps no court has focused this specifically on interest and that in each case the reviewing court has considered other factors, but the presence or absence of the payment of interest substantially reconciles the line of cases addressing the taxability of customer deposits. *See Van Wagoner,* 368 F.2d 95 (deposit premium received by insurance agent taxable upon receipt because agent had total discretion as to use and no interest paid); *Gilken Corp. v. Commissioner,* 176 F.2d 141 (6th Cir.1949) (sum received to secure lease covenants and as part of purchase price if option to buy exercised was taxable in the year of receipt—no interest was paid by the lessor); *Hirsch Improvement,* 143 F.2d 912 (sum paid at beginning of lease taxable income upon receipt where the sum was distributed to the shareholders and interest was not paid to the depositor); *Astor Holding Co.,* 135 F.2d 47 (sum paid at the beginning of the lease where recipient used the sum as its own and paid no interest to the depositor); *Clinton Hotel,* 128 F.2d 968 (sum paid at outset of lease not taxable were interest paid to the depositor and the deposit might be applied to many things besides the last year's rent); *American Telephone,* 55 T.C.M. 16 (deposits to secure payment of telephone bills upon which interest were paid were not taxable in the year of receipt); *Oak Industries, Inc. v. Commissioner,* 52 T.C.M. 1556 (1987) (sums received by subscription television company when customers obtained electronic decoder boxes were taxable income upon receipt—no interest was paid by the company); *J & E Enterprises,* 26 T.C.M. 944 (payment of sum at outset of lease was taxable income when received where there was no restrictions on its use and interest was not

paid). *Cf. Mantell v. Commissioner,* 17 T.C. 1143 (1952) (sum received at outset of lease was not taxable income when received even though no interest was paid to the lessee with respect to the sum). *See generally* Revenue Ruling 72–519, 1972–2 C.B. 32.

In *City Gas,* the Eleventh Circuit specifically down-played the importance of interest payments of the type IPL made stating that it "may reflect compensation for advance payment of income items. ..." 689 F.2d at 948 n. 7. The Eleventh Circuit cited *United States v. Williams,* 395 F.2d 508 (5th Cir.1968) in support of this proposition. In *Williams,* the taxpayer entered into an agreement granting a third-party the right to cut and purchase timber. Under the agreement the taxpayer received a sum, labelled a loan, that corresponded to the first ten years' rent. The taxpayer was to pay interest at 3% but the interest payment was offset by the annual rent owed by the third-party to the taxpayer. The Fifth Circuit reversed the district court's judgment in favor of the taxpayer, holding that the sum constituted an advance payment, not a loan. The Fifth Circuit observed that no due date was specified for the loan and that no promissory note was ever executed. The court also stated that it viewed "the interest charge as no more than compensation for [the] advance payment." *Id.* at 511. In essence, however, the Fifth Circuit merely collapsed the interest payment with the annual rent because it found that a bona fide loan was not created. In contrast, the enforceability of IPL's deposit obligations is *not* contested, only the legal consequences arising from them are at issue. *See also Commissioner v. Lyon,* 97 F.2d 70 (9th Cir.1938).

come item such as rent can be a distinct category from advance payments for tax purposes.

■ We emphasize the limited scope of our holding. The difficulty in these types of cases arises because the deposit to secure an income payment is given in conjunction with a contractual arrangement that also generates an income stream to the deposit recipient. The temptation, as the IRS's position demonstrates, is to always collapse the two. We hold only that this result is not automatically required. We therefore retain the traditional approach of analyzing the facts and circumstances to determine whether the principal purpose of a "deposit" is to secure future performance or to serve as an advance payment of income.[12]

### C.

■ Applying this test to the deposits received by IPL, we hold that the Tax Court's decision that these deposits served as security and were not prepayments of income is not clearly erroneous. Depositors received interest at 3% prior to 1976 and 6% after 1976. The Tax Court found this to be of "particular importance." *Indianapolis Power & Light Co. v. Commissioner*, 88 T.C. at 976. In addition, the Tax Court placed special emphasis on the fact that the customer "controlled" the timing of the refund. After 1976, for example, the deposit was automatically refunded if a customer paid his or her utility bill punctually for nine straight months. The IRS argues that the depositor always "controls" the deposit by merely complying with the contract terms for its refund, and further that in functional terms the deposit acts as a mere prepayment of the ninth month's bill. We agree with the Tax Court

that the indefiniteness of the length of time a customer deposit will be held is more consistent with a security deposit than a prepayment. Finally, the Tax Court found that IPL never intended to have the deposits serve as prepayments. The Tax Court's decision is AFFIRMED.[13]

12. As our prior discussion indicates, the payment or nonpayment of interest on a deposit is in our view a very important factor in analyzing the "facts and circumstances." We expect, however, that in a significant percentage of the cases involving these types of deposits, the differential between the interest rate paid and the probable return (which will usually be difficult to determine) generated by the deposit recipient's use of the deposit will be such that a reviewing court will also have to consider other factors to determine the "primary purpose" of the customer deposit.

13. We also reject the IRS's argument that we should adopt the *City Gas* test because it is more administratively convenient. The *City Gas* test also requires a court to look at all the facts and circumstances to discern the primary purpose of the deposit and therefore does not substantially simplify the review required.