OAK INDUSTRIES, INC. and Subsidiaries, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oak Industries, Inc. v. Commissioner
Docket No. 37866-84.
United States Tax Court
T.C. Memo 1987-65; 1987 Tax Ct. Memo LEXIS 61; 52 T.C.M. (CCH) 1556; T.C.M. (RIA) 87065; January 29, 1987. Ps were members of a partnership that conducted an over-the-air subscription television operation. Ps' broadcasting studio transmitted an over-the-air scrambled signal without the use of cables or wires. Subscribers received an electronic decoder box that unscrambled the signal. When a decoder was installed, the subscriber paid Ps a deposit refundable upon return of the decoder. The subscription agreement provided that the deposit could be used to offset (1) any fees owed by the subscriber upon termination of service, (2) any damage or destruction to the decoder, or (3) any costs or expenses incurred by the partnership as a result of the subscriber's breach of the subscription agreement. Held, the subscriber deposits were income to Ps upon receipt. Avram Salkin,Bruce I. Hochman, and Charles P. Rettig, for the petitioner. Steven Mather, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1974, 1977 and 1978 in the respective amounts of $15,533, $75,376 and $593,613. Before trial jobs credit, WIN credit, investment tax credit and research credit carryback issues were severed for the purpose of trial, briefing and opinion. A foreign tax credit issue for 1977 and investment tax credit issues for 1977 and 1978 have been settled. The only issue for decision in this case is whether petitioners should have included in gross income their distributive share of subscriber security deposits received by National Subscription Television during 1977 and 1978. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by reference. Petitioners filed consolidated income tax returns for 1977 and 1978. At the time the petition in this case was filed, petitioners' *63 principal place of business was in Rancho Bernardo, California. By partnership agreement dated November 28, 1975, petitioner Oak Television, Inc. and Chartwell Communications Group agreed to conduct an over-the-air subscription television (hereinafter referred to as STV) operation. The partnership originally chose the business name World Pay Television but later changed the business name to National Subscription Television (hereinafter referred to as NST). Petitioner Oak Television was entitled to 51 percent of NST's income, gains, deductons, losses and credits, and the Chartwell Communications Group was entitled to 49 percent of such items. Chartwell Communications Group was a California limited partnership. Its sole general partner was Chartwell Communications, Inc. whose only stockholder was A. Jerrold Perenchio. Perenchio served as managing partner for NST, responsible for programming, marketing, advertising and the general day-to-day business of the enterprise. Before broadcasting began on April, 1, 1977, NST developed equipment that enabled a broadcasting studio to transmit an over-the-air scrambled signal to the home of a subscriber without the use of cables or wires. *64 Petitioners also developed an electronic decoder box that enabled subscribers to receive an unscrambled signal in their homes. Each decoder box was given an address and could be turned on or off from the studio initiating the scrambled broadcast. It was necessary for NST to obtain authorization from the Federal Communications Commission (hereinafter referred to as FCC) before it could transmit its signal. In applying for FCC authorization, NST was required to submit the decoder box to the FCC for analysis and to submit an explanation of its business plan setting forth the financing of the operation, proposed programming and a list of the individuals who would be involved in the operation. At the time that NST filed its application, there were no FCC regulations concerning maximum monthly charges or maximum charges for security deposits. Nor were any such regulations subsequently adopted by the FCC. From April 1977 until after September 30, 1981, NST used the decoder in an STV operation in the Los Angeles area under the fictitious name "On TV." A decoder was installed in the home of each subscriber. During 1977 and 1978, NST collected $64.95 from each subscriber upon installation. *65 The subscription agreement in effect at that time allocated the $64.95 to a $39.95 "installation charge" and a $25 "security deposit." The decision to charge $25 as a security deposit was based on a number of factors. NST wanted to assure that the decoder boxes were returned when STV service was terminated to protect its $100 to $125 investment in each box and to prevent nonsubscribers from tampering with boxes in order to receive programs without paying for the STV service. Because the FCC would not allow NST to sell its decoders, NST sought to set a meaningful amount that would induce subscribers to return the boxes. Before commencing its operations, NST engaged several independent survey firms to provide assistance in deciding how much to charge for the deposit. In addition to performing surveys in shopping centers and supermarkets, the survey firms conducted over 20 focus groups to determine the reaction of potential subscribers to different amounts that might be charged for subscription deposits. As the attorney representing NST before the FCC, Robert Cahill discussed the refundable subscription deposit with FCC representatives on more than 50 occasions. Although the *66 FCC did not have any formal regulations restricting the amount that NST could charge as a deposit, NST was required to set forth information relating to the deposit on the FCC application for authorization. Cahill advised Perenchio that, in his opinion, the FCC authorization might be delayed or even denied if NST required a deposit of more than $25. When a subscription deposit was received, NST's books reflected an entry of a debit of $25 to cash and a credit of $25 to a liability account called "Subscriber Security Deposits." The entire $25 deposit was placed in NST's general account and was not segregated or placed in a trust account at any time. No interest was paid to the subscriber on the deposit.Until and unless it came time to refund the deposit, petitioner's use of the deposited funds was unrestricted. Within a few days after installation of the decoder, NST billed the subscriber for the first month's charge of $17.42. The subscriber then received a bill each month requiring him to pay $17.42 in advance for the STV service. The $17.42 monthly billing included a $7 charge for the decoder rental plus a 6 percent sales tax. From April 1, 1977, until early 1977, NST's *67 collection department caused a subscriber's reception to be turned off when the collection representative determined that a substantial delinquency had occurred. In January, 1979, NST began shutting off the subscriber's service if any portion of the monthly billing was unpaid for 90 days after the billing date. The subscription agreement provided that the subscriber and NST each had the right to terminate the STV service upon written notice and that upon termination the subscriber would pay all monthly fees due and surrender the decoder to NST. Under the terms of the agreement, upon termination of the STV service, NST would offset the deposit to be refunded against three charges: (1) the subscriber's account balance due to NST, (2) repair costs incurred by NST for decoder damage caused by the subscriber, and (3) costs incurred by NST for the subscriber's breach of the subscription agreement. When STV service was terminated, NST would compute the final amount owed by the subscriber. If a balance was due, NST would apply the $25 deposit against the balance and refund the excess to the subscriber. If no amount was due, NST would refund the entire $25 deposit plus any overpayments. *68 No money was refunded until the decoder was returned to the warehouse and tested. A sample study of refunds to customers was performed using all refunds made during the months of July 1978 and December 1978. These two samples are representative of NST's actual refund history. The subscription agreement in effect from 1977 until 1979 contained a liquidated damages clause requiring the subscriber to pay $350 for each decoder not returned upon termination of the STV service. The agreement also required the subscriber to pay for damage caused by tampering with the decoder. If the decoder was returned with only minor damage, the subscriber was usually not billed. NST would bill the subscriber for the full amount specified in the liquidated damages clause if a decoder was returned with signs of tampering or with major damage rendering it unworkable or if the decoder was not returned at all. NST brought may actions in small claims court against subscribers who failed to either return the decoders or to pay liquidated damages. Initiation of the small claims litigation encouraged many nonresponsive subscribers to return their decoder boxes. This litigation also resulted in recovery *69 of money damages. Before resorting to small claims litigation, NST made many efforts to recover decoders including the use of dunning letters, telephone contacts, postage paid mail-in boxes, and in-house and outside collection services. NST did not pursue small claims litigation if the decoder was returned in working order but there was a balance due on the subscriber's account. Instead, NST would turn bad accounts over to collection agencies after the decoders were returned. During 1977 and 1978 NST paid $105.30 for each of the first 50,000 decoders and $125 for each decoder in excess of 50,000. The price of a decoder on the "black market" ranged between $100 and $500. Many of the decoders used by NST during 1977 and 1978 were leased on net leases from United Medical Leasing Company, Inc. (hereinafter referred to as UML) and Walter E. Heller & Company (hereinafter referred to as Heller). These leases were capitalized leases and were principally financing arrangements between NST and UML and Heller. The leases required a security deposit in the form of restricted certificates of deposit. The interest on the certificates of deposit inured to the benefit of NST. Each year *70 one-seventh of the principal amount of the restricted certificates of deposit was released to NST to coincide with the reduced obligation of payments due from NST on the 7-year lease. By the end of the lease when the decoders were due to be returned, the restricted certificates of deposit had been reduced to zero. Independent subcontractors installed the decoders for NST. The subcontractors received an inventory of decoders to install for which no form of security deposit was required. Once the installation was performed, the subcontractor would deposit the day's receipts into an NST account. When installers reported that decoders were lost or stolen, NST typically billed them at a predetermined rate between $175 and $350. For financial accounting purposes, NST maintained an allowance for doubtful accounts and an allowance for unrecoverable decoder boxes. The allowance for unrecoverable decoder boxes was included in accumulated depreciation and amortization for financial statement purposes. The bad debt reserve appears on NST's financial statements as an allowance for doubtful accounts. The accounting entry creating or adding to the bad debt reserve was a debit to the bad *71 debt expense and a credit to allowance for doubtful accounts. This bad debt expense amount was deducted by NST for Federal income tax purposes. During the years 1977 through 1980, NST did not deduct as losses amounts attributable to lost or nonreturned decoder boxes. Such losses were accounted for through the allowance for nonrecoverable decoder boxes. Each year NST would test the bad debt and lost decoder reserves to determine whether the accruals during the year adequately reflected the exposure for losses. In justifying the reasonableness of the reserve on December 31, 1978, the $25 deposits that related to the anticipated uncollectible accounts were used to reduce the expected bad debt loss. In testing the adequacy of the reserve for lost decoder boxes at the end of 1977 and 1978, NST did not offset the $25 against the expected decoder box losses. OPINION Section 61(a)[1] provides that gross income includes "all income from whatever source derived * * *." Respondent argues that petitioners should have included in gross income their distributive share of subscriber security deposits *72 received by NST during 1977 and 1978. Respondent relies on City Gas Co. of Florida v. Commissioner,689 F.2d 943 (11th Cir. 1982), revg. and remanding 74 T.C. 386 (1980), decided on remand T.C. Memo. 1984-44, in which the Eleventh Circuit promulgated a "primary purpose" test for determining whether security deposits are includible in gross income upon receipt. The taxpayers in City Gas Co. were utility companies that provided gas and related services for which they billed their customers on a monthly basis. Each new customer was required to pay a refundable deposit that was typically credited against the customer's bill on termination. Any balance was refunded to the customer. If a customer had paid his last bill in full, the entire amount of the deposit was refunded to him. If a customer terminated service but intended to return to the area, he could pay all charges against his account and request the utilities to retain *73 his deposit pending his return to the area. State law required that any amounts of deposits not refunded within 15 years of termination of service escheated to the state. One of the taxpayers in City Gas Co. was a public utility, required by state regulations to pay interest on customer deposits. The other two taxpayers were not subject to state regulation and did not pay interest on customer deposits. Although the deposits were not physically segregated from general corporate funds, the taxpayers in City Gas Co. treated the deposits as current liabilities for both tax reporting and financial accounting purposes. This Court held that the amounts at issue did not constitute income upon receipt because the full amount of each deposit was unconditionally subject to refund. 74 T.C. at 394. In the opinion we reviewed the rules concerning tax treatment of security deposits received by lessors. If a sum received by a lessor at the beginning of the lease is subject to the lessor's unfettered control and the lessor has the right to apply the full amount of sums received during the year in issue to payment of a fixed rent for a later period during the term of the *74 lease, then the amounts received are advanced rentals rather than security deposits and are taxable upon receipt. See Gilken Corp. v. Commissioner,176 F.2d 141 (6th Cir. 1949), affg. 10 T.C. 445 (1948); Astor Holding Co. v. Commissioner,135 F.2d 47 (5th Cir. 1943), affg. a Memorandum Opinion of this Court; Commissioner v. Lyon,97 F.2d 70 (9th Cir. 1938), affg. a Memorandum Opinion of this Court. [2] If the amounts deposited with the lessor are to ensure safe return of the property or to secure the performance of the lessee's covenants under the lease, then the amounts deposited are considered a security deposit and not taxable unless and until the lessee defaults. Mantell v. Commissioner,17 T.C. 1143 (1952); Warren Service Corp. v. Commissioner,110 F.2d 723 (2d Cir. 1940), affg. on this ground 39 B.T.A. 856 (1939). The Commissioner argued that the rental cases distinguish between sums that secure the payment of rent for a future period and those that protect *75 a property interest, including in income only the former type of sum. We rejected that dichotomy, explaining that the test for inclusion in income established by the rental cases is whether the taxpayer had control over the amounts upon receipt. Sums which the parties agree to apply in full against a fixed future rental payment are subject to the lessor's control upon receipt, whereas the lessor's right to amounts protecting a property interest depends upon the contingency of a future event causing damage to the property. The Eleventh Circuit reversed and remanded the City Gas Co. case to this Court, holding that the test to apply in determining whether the customer deposits constituted income is whether the primary purpose of the deposits was to secure future payment for goods and services or to secure the performance of nonincome-producing covenants. The Eleventh Circuit explained: Often the purpose of an advance payment or deposit is mixed; it may serve both as security for property or performance of nonincome-producing covenants and also as a prepayment of bills, rent, or other charges for goods or services. * * * In such cases, the taxation of such payments must turn *76 on the circumstances of the transaction and the intent of the parties: if the primary purpose of the payment is to act as a prepayment for goods and services, then the amount constitutes taxable income; but if the primary purpose is to secure performance of nonincome-producing covenants or to secure against damage to property, then the payment is not taxable. * * * [689 F.2d at 946; emphasis in original.] On remand we found that the primary purpose of the customer deposits was to pay for gas consumed and therefore the amounts of the deposits were income upon receipt. T.C. Memo. 1984-44. The instant case is appealable to the United States Court of Appeals for the Ninth Circuit which has not yet expressed an opinion about the Eleventh Circuit's "primary purpose" test. Accordingly, although we accord it significant deference, we are not bound in this case by the opinion of the Eleventh Circuit in City Gas Co.Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971); Kent v. Commissioner,61 T.C. 133 (1973). Nevertheless, *77 whether we follow the rule of the Eleventh Circuit or the opinion of this Court in City Gas Co., the security deposits were includible in petitioners' gross income upon receipt. A. The Primary Purpose Petitioners assert that the primary purpose of the subscription deposits in this case was to secure the return of the decoder boxes, protecting petitioners' property interest in the decoder boxes. Respondent maintains that the primary purpose of the subscription deposits was to secure subscribers' receivable balances at termination of service. We agree with respondent. Because subscribers' receivable balances at termination of service were debts attributable to rent on the decoders and services the subscribers received, the subscription deposits constitute income items. Under the primary purpose test, they were income upon receipt. Respondent relies on six factors to prove that the security deposits secured subscriber debts to NST: (1) the subscription agreement, (2) similar agreements, (3) the amount charged for the security deposits, (4) NST's collection policies, (5) NST's refund history and (6) NST's accounting practices. Of these six factors the last three are most *78 helpful in determining the primary purpose of the subscriber deposits. 1. The Subscription Agreement. The subscription agreement provided that the security deposit could be used as an offset against: (1) fees or service charges due to NST after termination of service, (2) any costs incurred by NST to repair a decoder damaged or destroyed by the subscriber or (3) any costs or expenses incurred by NST as a result of the subscriber's breach of the subscription agreement. Under the terms of the subscription agreement, the purpose of the security agreement is mixed, i.e., to offset both income items (fees and service charges) and nonincome items (damage or destruction of the decoder). There is no indication on the subscription agreement as to which of these purposes was primary. 2. Similar Agreements. Respondent cites agreements between NST and other parties regarding the decoders to show the purpose of the security deposits. These other-party agreements are irrelevant to our present inquiry, however, because the facts and circumstances that gave rise to those agreements differ significantly from the circumstances creating a need for the security deposits at issue in this case. *79 [3]
*80 3. The Amount Charged for the Security Deposit. THe $25 fee charged for subscriber deposits has a closer relationship to NST's monthly bill of $17.42 than to the $125 cost of the decoder. The $25 is also closer to $52.26, the balance due in an account for which NST discontinued services because of a 90-day delinquency in payment. Respondent argues that the closer relationships of the deposit fee to the monthly and tri-monthly fee indicates that the purpose of the deposit was to secure monthly payments. NST's witnesses testified that the $25 amount was chosen as a result of marketing and regulatory concerns. We find this testimony credible in light of the extensive surveys performed for NST and the many times NST's attorney consulted with FCC representatives. Had NST charged an amount that approached the cost of the decoder, the transaction might have been deemed a sale. See Fort Pitt Brewing Co. v. Commissioner,20 T.C. 1 (1953), affd. 210 F.2d 6 (3d Cir. 1954), cert. denied 347 U.S. 989 (1954). In the real estate cases security deposits seldom approach the value of the value of the leased property and are consistent with *81 a portion of a year's rent. The amount charged in those cases is irrelevant in determining the purpose of the security deposit. Unless the purpose of the deposit is to secure rental payments, the security deposit is not includable in gross income. See Astor Holding Co. v. Commissioner,135 F.2d 47 (5th Cir. 1943); Mantell v. Commissioner,17 T.C. 1143 (1952). 4. NST's Collection Policies. NST relied upon several devices in addition to the subscriber deposit to assure the safe return of the decoder boxes, including the use of dunning letters, the employment of collection agencies and the initiation of small claims court litigation pursuant to a liquidated damages clause in the subscriber agreement. Respondent contends that NST's reliance upon other collection devices, especially the liquidated damages clause, indicates that the subscriber deposit was of little value to NST and that NST intended to use the liquidated damages clause to secure the safe return of the decoders instead. Petitioners have shown that the return of the decoders was important to their business both to protect their investment in the equipment and to prevent piracy of *82 NST's transmission signal. NST's reliance on other collection devices in addition to the requirement of a deposit merely underscores petitioners' concern for the return of the decoders and has little relevance in ascertaining the primary purpose of the deposit. Nevertheless, when NST relied on the liquidated damages clause, its practice was to bill the subscriber the full amount specified in the subscription agreement. NST did not deduct the $25 deposit from this bill, indicating that the deposit was not really meant to be applied to lost, damaged or stolen decoders. 5. NST's Refund History. NST's actual use of the subscriber deposits is an indication of their purpose. A sample study of refunds to customers was performed using all refunds made during the months of July, 1978 and December, 1978. The parties have stipulated that these two samples are representative of NST's actual refund history. Both petitioners and respondent rely on the same chart but interpret the numbers in different ways. The record does not contain sufficient information to determine which interpretation is correct. Under either interpretation, however, it appears that more often than not, NST offset *83 subscriber deposits against overdue receivable balances on subscriber accounts. [4] NST's refund history shows that subscriber deposits were intended to be used to offset overdue accounts. 6. NST's Accounting Practices. NST maintained a financial accounting reserve for bad debts (doubtful accounts) and another reserve for lost decoders. Each year NST tested the adequacy of the amounts in the bad debt reserve and in the lost decoder reserve. In justifying the amounts in the bad debt reserve, NST used the $25 deposit to reduce the expected bad debt loss. The $25 deposit was not used to offset the anticipated loss from lost or stolen decoders. The best evidence of NST's intent as to the use of the subscriber deposits is NST's actual treatment of them. In billing subscribers for lost, stolen or damaged decoders, NST requested the full amount specified in the liquidated damages clause rather than reducing the amount by the $25 deposit. Whenever there was a balance due to NST *84 from a subscriber at termination, NST offset the amount due by the $25 deposit. The $25 deposit was actually used to offset subscriber accounts for 60 to 70 percent of the accounts. Finally, for financial accounting purposes, NST treated the subscriber deposits as though they were to be applied to subscriber accounts that paid for services and rent on the decoders rather than to be used to secure the safe return of the decoders. Accordingly, we conclude that the primary purpose of the deposits in this case was to secure amounts due for services. Under the Eleventh Circuit's test in City Gas, the subscriber deposits were includable in income upon receipt. B. The "Taxpayer's Control" Test Because we conclude that NST had control over the subscriber deposits upon receipt, they are includable in income under the test promulgated by this Court in City Gas Co., 74 T.C. at 394-395. The subscription agreement provides in part: Subscriber acknowledges that [the subscriber] deposit is not a trust fund held by NST for the benefit of subscriber and that NST owes subscriber no fiduciary obligation with respect to such deposit. Subscriber further agrees that NST *85 may use such deposit as it sees fit and shall have no duty to hold such deposit in any separate account. Subscriber shall not have any right to nor shall NST be required to account for earnings or interest on such deposit. The characterization of the deposit does not turn on the absence of a special account, trust fund, or payment of interest. Clinton Hotel Realty Corp. v. Commissioner,128 F.2d 968 (5th Cir. 1942); Commissioner v. Lyon,97 F.2d 70 (9th Cir. 1938); Mantell v. Commissioner,17 T.C. 1143 (1952). Nevertheless, these are factors to be considered in measuring the amount of control the taxpayer had exercised over the deposits. Astor Holding Co. v. Commissioner,135 F.2d 47 (5th Cir. 1943). Clinton Hotel Realty Corp. v. Commissioner,supra;Gilken Corp. v. Commissioner,176 F.2d 141 (6th Cir. 1949). In this case, although the deposits were refundable, the parties have stipulated that NST had unrestricted use of the amounts deposited upon receipt. They were intended to be used against balances due for services upon termination of the STV service and in fact *86 were used frequently for that purpose. Unlike the taxpayers in City Gas Co. whose use of the customer deposits was restricted by state regulation, petitioners in this case had infettered control over the deposits. Accordingly, the subscriber deposits were income to NST upon receipt. An appropriate order will be issued.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect during the years in issue. All rule references are to the Tex Court Rules of Practice and Procedure.↩
2. See also J. & E. Enterprises, Inc. v. Commissioner,T.C. Memo. 1967-191↩.
3. NST leased decoders from UML and Heller for a period of 7 years and was required to pledge certificates of deposit to secure payment. Both parties agree that the certificates of deposit were required to secure payment under the leases rather than to secure the return of the decoders to UML and Heller. Although NST was required to return the decoders after 7 years, the UML and Heller leases were capital leases, i.e., financing devices for the purchase of decoder equipment. The relationship between NST, UML and Heller was different from the relationship between NST and its subscribers. UML and Heller were NST's creditors providing capital to purchase the decoders. NST provided services to its customers through the use of a decoder box that was to be returned upon termination of the services. Accordingly, the structure of the security deposit arrangement differed with each party. The interest earned by the certificates of deposit securing payment under the leases inured to the benefit of NST, whereas no interest was paid to the subscribers for their deposits. The payments to UML and Heller were fixed obligations for a period of 7 years; subscriber obligations were terminable at any time on short notice. As the balance owing to UML and Heller was reduced, the amount of the required security deposit was also reduced. The amount of each subscriber deposit remained fixed at $25 and was not refundable until the decoder was returned. The return of decoders was not necessary for the reduction of the amounts held in the certificates of deposit for the benefit of UML and Heller. Independent subcontractors installed most of the decoders for NST. These subcontractors were required to account for the decoders they received by serial number. The number of decoders lost by subcontractors was similar to the number lost through subscribers. Nevertheless, NST did not require a security deposit from its subcontractors. Instead, the company relied on a liquidated damages clause and billed subcontractors for any decoders that they lost. Respondent maintains that NST did not require a deposit from subcontractors because NST usually owed money to subcontractors and therefore did not need to secure receivables from them as it did in the case of subscribers. We disagree. There was no need for a security deposit from the installer-subcontractors. Subcontractors held the decoders for a few days only and could be trusted to account for them. Most of the subcontractors were reputable companies like Sears, Teledyne and General Electric that had the adequate financial resources to cover the cost of any claims. NST's customers, on the other hand, lacked the reliability and financial ability of its subcontractors. Consequently, NST required additional security from its customers. Respondent also cites a subscription agreement used by a Chicago partnership in which Oak Industries was involved. The Chicago partnership is not a party in this case. Accordingly, the purpose of the security deposits used by the Chicago partnership is irrelevant to this case.↩
4. Respondent argues that for approximately 70 percent of all disconnecting subscribers, all or a portion of the subscriber deposit was offset. Under petitioners' analysis this figure is 61 percent.↩