OAK INDUSTRIES, INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 37866-84.        Filed April 1, 1991.

*John P. Warner,* for the petitioner.
*Margaret R. Reichenberg,* for the respondent.

### OPINION

NIMS, *Chief Judge:* This case is before the Court for reconsideration of the opinion in *Oak Industries, Inc. v. Commissioner,* T.C. Memo. 1987-65, filed January 29, 1987. The sole issue for decision is whether the opinion in *Oak Industries, Inc. v. Commissioner, supra,* should be revised due to the Supreme Court's decision in *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. 203 (1990), filed January 9, 1990.

By statutory notice of deficiency dated August 10, 1984, respondent determined deficiencies in petitioners' Federal income taxes for 1974, 1977, and 1978 in the amounts of $15,533, $75,376, and $593,613, respectively.

Petitioners filed consolidated income tax returns for 1977 and 1978. At the time the petition in this case was filed,

petitioners' principal place of business was in Rancho Bernardo, California.

In their petition, petitioners alleged that respondent erroneously: (1) Increased their distributive share of ordinary income from National Subscription Television by including the security deposits received by National Subscription Television during 1977 and 1978 in taxable income (security deposit issue); (2) computed the amount of foreign tax credit available in 1977 and investment tax credit available in 1977 and 1978 (foreign tax credit issue); and (3) failed to take into account jobs credit, win credit, investment tax credit, and research credit carrybacks from 1979, 1980, and 1981 (credit carryback issue). (The parties have settled the foreign tax credit issue.)

On January 29, 1986, the security deposit issue was severed from the credit carryback issue for purposes of trial, briefing, and opinion. In *Oak Industries, Inc. v. Commissioner, supra,* we held that petitioners must include their distributive share of the security deposits received by National Subscription Television during 1977 and 1978 in gross income. Trial on the credit carryback issue was continued to allow respondent to complete audits of petitioners' Federal income tax returns for 1980, 1981, 1982, and 1983 and to permit the Congressional Joint Committee on Taxation to review refund claims arising from respondent's tentative audit findings.

On May 10, 1990, petitioners filed a motion for leave to file a motion for reconsideration of opinion out of time and lodged a motion for reconsideration of opinion, without further hearing. By order dated May 21, 1990, this Court granted petitioners leave to file their motion for reconsideration and ordered respondent to file a response thereto.

On July 16, 1990, respondent filed an objection to petitioners' motion for reconsideration. By order dated August 10, 1990, we granted petitioners' motion for reconsideration and ordered the parties to file simultaneous briefs discussing the applicability of *Commissioner v. Indianapolis Power & Light Co., supra,* to the facts of this case. On November 1, 1990, the parties filed briefs discussing the applicability of *Commissioner v. Indianapolis Power & Light Co., supra.*

## Background

Petitioners were partners in a partnership known as National Subscription Television (NST). NST was organized to conduct an over-the-air subscription television operation. NST developed equipment that enabled it to transmit an over-the-air scrambled signal. NST also developed an electronic decoder box that allowed subscribers to receive the unscrambled signal in their homes.

NST installed a decoder box in the home of each subscriber and collected $64.95 from each subscriber at the time of installation. The subscription agreement in effect at the time of installation allocated the $64.95 to a $39.95 "installation charge" and a $25 "security deposit."

When it received a security deposit, NST would reflect the security deposit on its books as a debit to cash and a credit to a liability account called "Subscriber Security Deposits." NST placed the security deposits in its general account and did not segregate or place the security deposits in a trust account at any time. NST did not pay interest on the deposits and had unrestricted use of the deposits until and unless the time came for the deposits to be refunded.

NST billed subscribers for the first month's charge of $17.42 within a few days after the decoder was installed. Thereafter, NST billed each subscriber in advance for the $17.42 monthly service charge. NST would turn off the reception of any subscriber who became substantially delinquent in his monthly billing.

Under the subscription agreement, the subscriber and NST each had the right to terminate the service upon written notice. Upon termination, the subscriber agreed to pay all monthly fees due and surrender the decoder to NST. The subscription agreement allowed NST to use the security deposits as an offset against: (1) Any fees due NST at disconnect; (2) any cost incurred by NST to repair a decoder damaged or destroyed by the subscriber; or (3) any cost and expenses which NST might suffer by reason of breach of the agreement by the subscriber.

The subscription agreement contained a liquidated damages clause that required the subscriber to pay $350 for each decoder not returned or for a decoder that was returned damaged. NST would bill the subscriber for the full

amount of the liquidated damages with no offset for the amount of the security deposit.

When services were terminated, NST would compute the final amount owed by the subscriber. If a balance was due, NST would reduce the $25 security deposit by the amount of the balance due and refund the excess to the subscriber. If no amount was due, NST would refund the entire $25 security deposit plus any overpayments to the subscriber. Some portion of the $25 deposit was used to offset subscriber accounts for 60 to 70 percent of the accounts.

For financial accounting purposes, NST maintained an allowance for unrecoverable decoder boxes and an allowance for doubtful accounts. The $25 security deposit was not used to offset the anticipated loss from lost or stolen decoders. In justifying the amounts in the bad debt reserve, however, NST used the $25 deposit to reduce the expected bad debt loss.

In *Oak Industries, Inc. v. Commissioner, supra,* we held that petitioners should have included the security deposits received by NST in gross income because the deposits were includable under both: (1) The "primary purpose test" promulgated by the Eleventh Circuit in *City Gas Co. of Florida v. Commissioner,* 689 F.2d 943 (11th Cir. 1982), revg. and remanding 74 T.C. 386 (1980), decided on remand T.C. Memo. 1984-44; and (2) the "facts and circumstances test" promulgated by this Court in *City Gas Co. of Florida v. Commissioner,* 74 T.C. 386 (1980).

Petitioners "submit that the Supreme Court decision in *Indianapolis Power & Light* undermines both bases for this Court's opinion" and "requires a conclusion that petitioners are not taxable on their distributive share of customer deposits received by NST in the year of receipt."

## Discussion

Section 61(a) defines gross income as all income from whatever source derived, including compensation for services and gross income derived from business. (Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.) Advance payments of income are includable in gross income

in the year the advance payment is received. *Schlude v. Commissioner,* 372 U.S. 128 (1963); *American Automobile Association v. United States,* 367 U.S. 687 (1961); *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180 (1957). However, the recipient of a deposit is not required to include the deposit in gross income. *Indianapolis Power & Light Co. v. Commissioner,* 857 F.2d 1162, 1165 (7th Cir. 1988); *Clinton Hotel Realty Corp. v. Commissioner,* 128 F.2d 968, 969 (5th Cir. 1942). It is well settled that the receipt of a loan is also not income to the borrower. *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. 203 (1990). In economic terms the distinction between a loan and an advance payment is one of degree rather than of kind. *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. at _____ .

Before the Supreme Court's decision in *Commissioner v. Indianapolis Power & Light Co., supra,* two separate tests existed for determining whether deposits should be included in taxable income upon receipt.

*Facts and Circumstances Test*

In *City Gas Co. of Florida v. Commissioner,* 74 T.C. 386, 394-395 (1980) (*City Gas I*), this Court promulgated a "facts and circumstances test" (also referred to as a "control test") for determining whether a deposit should be included in taxable income. Under the facts and circumstances test, all the facts and circumstances surrounding the deposit were examined to determine whether the primary purpose of the deposit was to be an advance payment or security to assure that the customer would pay all bills on termination. *City Gas I,* 74 T.C. at 391. Of particular importance was whether the taxpayer had unrestricted control over the deposits. *Indianapolis Power & Light Co. v. Commissioner,* 88 T.C. 964, 976 (1987), affd. 857 F.2d 1162 (7th Cir. 1988), affd. 493 U.S. 203 (1990); *City Gas I,* 74 T.C. at 394-395.

*Primary Purpose Test*

In *City Gas Co. of Florida v. Commissioner,* 689 F.2d 943 (11th Cir. 1982) (*City Gas II*), the Eleventh Circuit reversed and remanded our decision in *City Gas I* and directed us to apply a "primary purpose test" for determining whether

deposits should be included in taxable income. The Eleventh Circuit stated that "if the *primary* purpose of the payment is to act as a prepayment for goods and services, then the amount constitutes taxable income; but if the *primary* purpose is to secure performance of non-income-producing covenants or to secure against damage to property, then the payment is not taxable." *City Gas II,* 689 F.2d at 946. Under the primary purpose test, "deposits must be categorized either as prepayments for goods and services on the one hand, or as security for the performance of nonincome-producing covenants on the other." *City Gas Co. of Florida v. Commissioner,* T.C. Memo. 1984-44, 47 T.C.M. 971, 973, 53 P-H Memo T.C. par. 84,044 at 163. The primary purpose that the deposit was intended to serve is derived by examining the surrounding circumstances. *City Gas II,* 689 F.2d at 947-948.

*Oak Industries*

In *Oak Industries, Inc. v. Commissioner, supra,* we held that the deposits were includable in taxable income under the primary purpose test. The best evidence of NST's intent with respect to the deposits was shown by its actual treatment of them. Specifically, NST requested the full amount specified in the liquidated damages clause for lost, stolen, or damaged decoders rather than reducing the amount by the $25 deposit. At termination, NST offset any amount due by the $25 deposit. Finally, for financial accounting purposes, NST treated the subscriber deposits as though they were to be applied to subscriber accounts that paid for services and rent on the decoders rather than to be used to secure the safe return of the decoders. Thus, we found that the primary purpose of the deposits was to act as a prepayment for services rather than to secure the performance of non-income-producing covenants.

We also held that the deposits were includable in taxable income under the facts and circumstances test. In *Oak Industries, Inc. v. Commissioner, supra,* we described the facts and circumstances test as follows:

the test for inclusion in income established by the rental cases is whether the taxpayer had control over the amounts upon receipt. Sums which the parties agree to apply in full against a fixed future rental payment are

subject to the lessor's control upon receipt, whereas the lessor's right to amounts protecting a property interest depends upon the contingency of a future event causing damage to the property.

\* \* \* \* \* \* \*

The characterization of the deposit does not turn on the absence of a special account, trust fund, or payment of interest. [Citations omitted.] Nevertheless, these are factors to be considered in measuring the amount of control the taxpayer had exercised over the deposits.

[T.C. Memo. 1987-65, 52 T.C.M. 1556, 1559, 56 P-H Memo T.C. par. 87,065 at 305, 308. Citations omitted.]

NST's "unfettered control" over the deposits was evidenced by the fact that: (1) NST's use of the deposits was unrestricted; (2) NST did not hold the deposits in a trust fund or separate account; (3) NST was not required to pay interest on the deposits; and (4) NST intended to use the deposits against balances due for services upon termination and frequently used the deposits for that purpose. Thus, we found that the deposits were intended to be advance payments rather than security to assure that the subscriber would pay all bills on termination.

### Indianapolis Power & Light Co.

In *Indianapolis Power & Light Co. v. Commissioner*, 88 T.C. 964 (1987) (*Indianapolis Power I*), affd. 857 F.2d 1162 (7th Cir. 1988), affd. 493 U.S. 203 (1990), the taxpayer, a utility that generated and sold electricity, required certain of its customers to make deposits "to insure prompt payment" of future utility bills. These customers were selected because their credit was suspect. A customer was entitled to a refund of his deposit after either making timely payments for a certain period of months or satisfying a credit test. The customer could choose to take his refund by cash or check or by applying the refund against future bills. The deposits were commingled with other receipts and at all times were subject to the taxpayer's unfettered use and control. The taxpayer was not required to pay interest on any deposit held for less than 6 months.

In *Indianapolis Power I*, 88 T.C. at 973-976, we reviewed cases analyzing the differences between advance payments and security deposits and concluded those cases did not

support the primary purpose test articulated by the Eleventh Circuit in *City Gas II,* 689 F.2d 943 (11th Cir. 1982). As a result, we stated that "we should continue to examine all of the facts and circumstances surrounding a deposit to evaluate the rights retained by the depositor and the rights acquired by the holder" to determine whether the deposit was taxable income. *Indianapolis Power I,* 88 T.C. at 976. After examining all the facts and circumstances, we concluded that the deposits received by the taxpayer were security deposits, not advance payments, and, thus, were not includable in taxable income. *Indianapolis Power I,* 88 T.C. at 978.

In *Indianapolis Power & Light Co. v. Commissioner,* 857 F.2d 1162 (7th Cir. 1988), affg. 88 T.C. 964 (1987) (*Indianapolis Power II*), the Seventh Circuit affirmed our application of the facts and circumstances test rather than the primary purpose test for purposes of determining whether deposits were taxable income. The Supreme Court affirmed the Seventh Circuit's decision in *Commissioner v. Indianapolis Power & Light Co.,* 493 U.S. 203 (1990) (*Indianapolis Power III*).

### Complete Dominion Test

Petitioners assert that "the Supreme Court's decision in [*Indianapolis Power III*] rejected the primary purpose test" promulgated by the Eleventh Circuit in *City Gas II* for determining whether deposits are taxable upon receipt.

In *Indianapolis Power III,* 493 U.S. at ___ , the Supreme Court stated that whether the deposits should be included in taxable income:

turns upon the nature of the rights and obligations that [the taxpayer] assumed when the deposits were made. In determining what sort of economic benefits qualify as income, this Court has invoked various formulations. It has referred, for example, to "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." [Citations omitted]. It also has stated: "When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, 'he has received income. * * * ' " [Citations omitted.] [The taxpayer] hardly enjoyed "complete dominion" over the customer deposits entrusted to it. Rather, these deposits were acquired subject to an express "obligation to repay," either at the time service

was terminated or at the time a customer established good credit. So long as the customer fulfills his legal obligation to make timely payments, his deposit ultimately is to be refunded, and both the timing and method of that refund are largely within the control of the customer.

In sum, whether deposits should be included in taxable income turns upon the nature of the rights and obligations that the taxpayer assumed when the deposits were made. Because the taxpayer acquired the deposits subject to an express "obligation to repay," the taxpayer did not enjoy "complete dominion" over the deposits entrusted to it. So long as the depositor made timely payments, the deposit would be refunded to the depositor and, thus, both the timing and method of that refund were largely within the control of the depositor.

The Supreme Court did not place any relevance on whether the primary purpose of the deposits was to secure the performance of income-producing covenants rather than non-income-producing covenants. Consequently, the Supreme Court effectively rejected the primary purpose test promulgated by the Eleventh Circuit in *City Gas II.*

Petitioners assert that "application of the standards set forth by the Supreme Court in [*Indianapolis Power III*] requires that the subscriber deposits received by NST not be taxable on receipt."

In the instant case, the subscription agreement, effective when the deposits were made, provided in part as follows:

2. *Payment of Monthly Fees.* Subscriber agrees to pay in advance the monthly fees set forth on the face hereof * * * .

3. *Termination.* Subscriber and NST shall each have the right to terminate this Agreement at any time by giving written notice of such termination to the other party. NST may terminate this Agreement by written notification for failure of subscriber to pay monthly fees when due. Upon termination, subscriber shall forthwith pay NST all monthly fees due up to the date of such termination, and shall forthwith surrender the Decoder to NST.

　　　*　　*　　*　　*　　*　　*　　*

6. *Refundable Deposit.* The deposit set forth on the reverse hereof is received by NST as security for the faithful performance by Subscriber of the terms of this Agreement or in any amendment hereto. Such deposit may be used as an offset against any fees due NST at disconnect, any costs incurred by NST to repair a Decoder damaged or destroyed by Subscriber, or any costs and expenses which NST may suffer by reason of any breach of this Agreement by Subscriber. * * * Upon condition

that Subscriber shall have performed fully all of the terms hereunder, NST shall return to Subscriber the amount of the deposit within 30 days following the return of the Decoder to NST.

The subscriber was contractually obligated to pay for monthly services in advance and at termination to pay all monthly fees due and surrender the decoder. The security deposit was intended to secure faithful performance of the terms of the agreement by the subscriber. NST was only permitted to keep the security deposit if the subscriber breached his obligations under the agreement. Otherwise, NST was required to refund the full amount of the deposit within 30 days after the decoder was returned.

### Control

Respondent, however, asserts that NST had control over the deposits because paragraph 6 of the subscription agreement gave NST full control over the deposits upon receipt. Petitioner counters that the portion of paragraph 6 referred to by respondent relates "solely to NST's obligations *while* it possessed the deposits" and that "unrestricted temporary use" is not relevant in determining whether a deposit is taxable income.

In part, paragraph 6 provides:

SUBSCRIBER ACKNOWLEDGES THAT SUCH DEPOSIT IS NOT A TRUST FUND HELD BY NST FOR THE BENEFIT OF SUBSCRIBER AND THAT NST OWES SUBSCRIBER NO FIDUCIARY OBLIGATION WITH RESPECT TO SUCH DEPOSIT. SUBSCRIBER FURTHER AGREES THAT NST MAY USE SUCH DEPOSIT AS IT SEES FIT AND SHALL HAVE NO DUTY TO HOLD SUCH DEPOSIT IN ANY SEPARATE ACCOUNT OR TO ACCOUNT FOR EARNINGS OR INTEREST THEREON.

In *Oak Industries, Inc. v. Commissioner, supra,* we noted that the absence of a special account, trust fund, and the payment of interest are factors to be considered in measuring the amount of control that the taxpayer has over the deposit. See *Indianapolis Power I,* 88 T.C. at 976. Consequently, NST's unrestricted use of the amounts deposited and its failure to pay interest on the deposits were evidence showing NST had "unfettered control" over the deposits.

## Unrestricted Use

In *Indianapolis Power III,* 493 U.S. at ___ , the Commissioner also stressed the fact that the deposits received by the taxpayer were not placed in escrow or segregated from the taxpayer's general funds and that the taxpayer enjoyed unrestricted use of the money.

The Supreme Court stated:

> That circumstance, however, cannot be dispositive. After all, the same might be said of a commercial loan; yet the Commissioner does not suggest that a loan is taxable upon receipt simply because the borrower is free to use the funds in whatever fashion he chooses until the time of repayment. In determining whether a taxpayer enjoys "complete dominion" over a given sum, the crucial point is not whether his use of the funds is unconstrained during some interim period. The key is whether the taxpayer has some guarantee that he will be allowed to keep the money. * * * [*Indianapolis Power III,* 493 U.S. at ___ .]

The fact that NST could use the deposits "as it sees fit" and was not required to segregate the deposits in a separate account is not dispositive in determining whether NST had "complete dominion" over the deposits. NST's control over the use of the deposits was no different than the control exercised by a borrower over loan proceeds in a commercial loan situation. It follows that NST's unconstrained use of the deposits during the interim period before the time of refund is not crucial in determining whether NST had "complete dominion" over the deposits. Instead, the key is whether NST had some guarantee that it would be allowed to keep the money. Cf. *Ware v. Commissioner,* 906 F.2d 62, 65 (2d Cir. 1990).

## Interest

In *Indianapolis Power III,* 493 U.S. at ___ , the Supreme Court also stated that:

> Nor is it especially significant that these deposits could be expected to generate income greater than the modest interest [the taxpayer] was required to pay. Again, the same could be said of a commercial loan, since, as has been noted, a business is unlikely to borrow unless it believes that it can realize benefits that exceed the cost of servicing the debt. A bank could hardly operate profitably if its earnings on deposits did not surpass its interest obligations; but the deposits themselves are not treated as income. [Fn. ref. omitted.] Any income that the utility may earn through use of the deposit money of course is taxable, but the

prospect that income will be generated provides no ground for taxing the principal.

The fact that NST did not have to account to depositors for earnings or interest on the deposits is also not "especially significant" in determining whether the deposits are taxable income. Once again, in a commercial loan situation, a borrower is under no obligation to account to the lender for earnings from the loan proceeds and generally borrows with an expectation of earning more income on the loan proceeds than interest paid the lender. NST will be required to pay tax on income that the deposits earn but that is no grounds for taxing the deposits.

## Guarantee of Payment

Respondent asserts that NST had a guarantee that it would be allowed to keep the deposits because "even if a customer paid regularly, [NST] could offset the deposit at disconnect." Petitioners counter that NST did not have a guarantee that it would be allowed to keep the deposits because "NST customers who fulfilled their contractual obligations * * * had every right to demand the return of their subscriber deposits."

NST was allowed to offset the deposit to be refunded against any account balance due NST, repair costs for decoder damage, or costs due to the subscriber's breach of the agreement. However, the subscriber was entitled to a full refund of the deposit if the subscriber fully performed the terms of the agreement. The subscriber expressly promised in paragraphs 2 and 3 of the agreement "to pay in advance the monthly fees" and to "pay NST all monthly fees due up to the date of such termination, and shall forthwith surrender the Decoder to NST," respectively. Thus, NST had no guarantee that it could keep the deposit because the subscriber controlled whether the deposit would be refunded or applied against amounts due for services.

Respondent further asserts that the opinion in *Oak Industries, Inc.* should not be revised because the instant case is factually distinguishable from the *Indianapolis Power III* case. Petitioners counter that respondent's "purported distinctions, however, are either nonexistent or, in light of the Supreme Court decision in [*Indianapolis Power*

*III*], not material to the determination of whether customer deposits are taxable upon receipt."

Respondent first asserts that the facts of the instant case are distinguishable from *Indianapolis Power III* because "the taxpayer's right to keep the customer deposits depended upon the customer's decision to actually purchase electricity." Petitioners counter that the subscribers in the instant case, like the customers in *Indianapolis Power III*, "were under no obligation to pay for additional service when they made their deposits."

In *Indianapolis Power III*, 493 U.S. at ___ , the Supreme Court contrasted an advance payment with a deposit by stating:

An advance payment, like the deposits at issue here, concededly protects that seller against the risk that it would be unable to collect money owed it after it has furnished goods or services. But an advance payment does much more: it protects against the risk that the purchaser will back out of the deal before the seller performs. From the moment an advance payment is made, the seller is assured that, so long as it fulfills its contractual obligation, the money is its to keep. Here, in contrast, a customer submitting a deposit made no commitment to purchase a specified quantity of electricity, or indeed to purchase any electricity at all. [Fn. ref. omitted.] [The taxpayer's] right to keep the money depends upon the customer's purchase of electricity, and upon his later decision to have the deposit applied to future bills, not merely upon the utility's adherence to its contractual duties. Under these circumstances, [the taxpayer's] dominion over the fund is far less complete than is ordinarily the case in an advance-payment situation.

In the instant case, the subscription agreement gave each party "the right to terminate this Agreement at any time" and permitted NST to apply the deposit to future bills only if the subscriber breached his obligation to pay the monthly fee in advance and to "pay NST all monthly fees due up to the date of such termination." The subscriber made no commitment to purchase a specified amount of services from NST, or indeed to purchase any at all. NST's adherence to its contractual obligations under the subscription agreement did not give it the right to keep the deposits. Therefore, NST's dominion over the deposits was essentially the same as that exercised by the taxpayers in *Indianapolis Power III* and far less complete than is ordinarily the case in an advance payment situation.

Respondent further asserts that the facts of the instant case and *Indianapolis Power III* are distinguishable based on the distinctions noted by this Court in *Indianapolis Power I,* 88 T.C. 964, 978 n.6 (1987).

In *Indianapolis Power I,* 88 T.C. at 978 n.6, we stated:

Unlike *Oak Industries, Inc. v. Commissioner,* T.C. Memo. 1987-65, on the evidence before us, we cannot conclude that the customer deposits were intended to be used against balances due for services upon termination. In *Oak Industries,* all or a portion of the customer deposits were credited to final bills for between 61 and 70 percent of all customer terminations. In that case, all customers had to pay a customer deposit, the taxpayer paid no interest on customer deposits, and the taxpayer had a very well-developed delinquent-account collection system.

In *Indianapolis Power I,* 88 T.C. at 971, we examined all the surrounding facts and circumstances to determine whether the deposits were intended to be advance payments for services or security to assure that the customer would pay all bills upon termination.

In the instant case, all subscribers were required to pay a deposit, whereas in *Indianapolis Power I* only those customers that were not creditworthy were required to pay deposits. The fact that only a portion of the customers in *Indianapolis Power I* were required to make deposits was "highly persuasive evidence that the deposits were not intended as advance payments." *Indianapolis Power I,* 88 T.C. at 976-977. Thus, NST's requirement that all subscribers pay deposits was evidence that the deposits were intended to be advance payments. Furthermore, NST's well-developed collection system was evidence showing that the deposits were not primarily intended to be security to assure that the subscriber would return the decoder.

Petitioners argue, however, that "The Supreme Court decision * * * undermined any probative value that such factor[s] had" because the "Court's test—the taxpayer's unilateral right to control the ultimate disposition of a deposit—is an objective standard that looks solely to the parties' rights over those deposits that are made."

Whether deposits are taxable income turns on the nature of the rights and obligations a taxpayer assumed when the deposits were made. *Indianapolis Power III,* 493 U.S. at ___ . The fact that NST required all depositors to make

deposits and had a collection system does not in any way limit the depositor's right to receive a refund of his deposit. Therefore, those facts are not relevant in determining the nature of the rights and obligations NST assumed when the deposits were made.

### Deposits Applied for Services

The fact that a substantial portion of NST's subscribers actually applied their deposits to pay for services is also not relevant in determining the nature of the rights and obligations NST assumed when the deposits were made.

In *Indianapolis Power III*, 493 U.S. at ____ , the Commissioner argued that from a cash-flow standpoint the deposits were equivalent to advance payments because depositors frequently chose to apply the deposits to pay for services rather than receive a refund. The Supreme Court disagreed with the Commissioner by stating:

> Whether these payments constitute income when received, however, depends upon the parties' rights and obligations *at the time the payments are made.* The problem with [the Commissioner's] argument perhaps can best be understood if we imagine a loan between parties involved in an ongoing commercial relationship. At the time the loan falls due, the lender may decide to apply the money owed him to the purchase of goods or services rather than to accept repayment in cash. But this decision does not mean that the loan, when made, was an advance payment after all. The lender in effect has taken repayment of his money (as was his contractual right) and has chosen to use the proceeds for the purchase of goods or services from the borrower. * * * [*Indianapolis Power III,* 493 U.S. at ____ .]

In the instant case, the subscription agreement, a standard contract entered into by NST with each subscriber, stated that the security deposit would be refunded so long as the depositor fulfilled the terms of the agreement. A substantial portion of NST's subscribers applied at least some portion of their deposits to pay monthly service charges at termination. However, the fact that many subscribers decided to apply the deposits owed them to pay for monthly service charges does not mean that the deposits were advance payments at the time they were made. The subscriber has merely taken the refund of his deposit and chosen to apply it to his monthly service charge.

As the Supreme Court noted, "It may be that a transfer of funds, though nominally a loan, may conceal an unstated agreement that the money is to be applied to the purchase of * * * services. * * * [However, the fact] That the utility's customers, when they qualify for refunds of deposits, frequently choose to apply those refunds to future bills rather than taking repayment in cash does not mean that any customer has made an unspoken commitment to do so." *Indianapolis Power III,* 493 U.S. at ___ . Respondent does not suggest and the record contains no evidence showing that NST and its subscribers entered into an "unstated agreement" to apply the deposits to pay for monthly service charges. Consequently, the fact that many subscribers chose to apply a portion of their deposits to pay for services rather than taking a refund does not mean that any subscriber had an "unspoken commitment" to do so.

In *Indianapolis Power I,* 88 T.C. at 978 n.6, we also noted that NST, unlike the taxpayers in *Indianapolis Power I,* did not pay interest on the deposits. As discussed above, the subscription agreement did not require NST to account to the subscribers "for earnings or interest" on the deposits. However, the Supreme Court has stated that the failure to account to the depositor for earnings on the deposit is not "especially significant" and "provides no ground for taxing the principal." *Indianapolis Power III,* 493 U.S. at ___ . Thus, NST's failure to account to the depositors for interest is not "especially significant" in determining whether deposits are taxable income.

Respondent further asserts that the instant case is distinguishable from *Indianapolis Power III* because "there is a closer analogy between the instant case and the prepaid rental cases cited in *Commissioner v. Indianapolis Power & Light* than to the utility deposits at issue in that case."

In *Indianapolis Power III,* 493 U.S. at ___ , the Supreme Court stated:

Our decision is also consistent with the Tax Court's long-standing treatment of lease deposits—perhaps the closest analogy to the present situation. The Tax Court has traditionally distinguished between a sum designated as a prepayment of rent—which is taxable upon receipt—and a sum deposited to secure the tenant's performance of a lease agreement. See, *e.g., J. & E. Enterprises, Inc. v. Commissioner,* 26 TCM 944 (1967). [Fn. ref. omitted.] In fact, the customer deposits at issue here are less

plausibly regarded as income than lease deposits would be. The typical lease deposit secures the tenant's fulfillment of a contractual obligation to pay a specified rent throughout the term of the lease. The utility customer, however, makes no commitment to purchase any services at all at the time he tenders the deposit.

NST's subscribers were under no obligation to purchase any services at the time they tendered their deposits. Thus, the security deposits in the instant case like the security deposits in the *Indianapolis Power III* case are less plausibly regarded as income than deposits made to secure the performance of a lease agreement.

Respondent, nonetheless, argues that the instant case is more analogous to the prepaid rental cases cited by the Supreme Court. In *Indianapolis Power III*, 493 U.S. at ____ , the Supreme Court cited *J. & E. Enterprises, Inc. v. Commissioner*, T.C. Memo. 1967-191, in the body of its opinion and also referred in footnote 9 to other lease cases involving security deposits. See *Hirsch Improvement Co. v. Commissioner*, 143 F.2d 912 (2d Cir. 1944); *Mantell v. Commissioner*, 17 T.C. 1143 (1952); *Gilken Corp. v. Commissioner*, 10 T.C. 445 (1948), affd. 176 F.2d 141 (6th Cir. 1949).

Respondent claims that the analogy between *J. & E. Enterprises* and the instant case is "obvious" because like the lease in *J. & E. Enterprises* the subscription agreement in the instant case: (1) "leaves the circumstance of repayment solely within the control of NST"; (2) "does not require NST to segregate the subscriber deposits nor to pay interest on the deposits"; and (3) "places no restriction on NST's use or disposition of the deposits."

As noted previously, whether a security deposit is taxable income turns upon the nature of the rights and obligations that NST assumed when the deposits were made. *Indianapolis Power III*, 493 U.S. at ____ . NST did not enjoy "complete dominion" over the deposits when they were made because NST was under an obligation to repay the deposits so long as the subscriber fulfilled the terms of the agreement. In *J. & E. Enterprises*, the lessor had an option under the lease to return the deposit to the lessee or apply it to the rent payable during the last year of the lease. It follows that the lessor had control over the deposit when the deposit was made. Therefore, the *J. & E. Enterprises* case is distinguish-

able from the instant case because the lessor in *J. & E. Enterprises* had control of the deposit when it was made.

As noted above, NST's unrestricted use of the deposits is not "dispositive," and its failure to pay interest on the deposits is not "especially significant" in determining whether a taxpayer had "complete dominion" over the security deposits. *Indianapolis Power III,* 493 U.S. at ___ . "The key is whether the taxpayer has some guarantee that he will be allowed to keep the money." *Indianapolis Power III,* 493 U.S. at ___ . NST did not have any guarantee that it could keep the deposits because the subscriber controlled whether his deposit would be refunded. Lacking such a guarantee, NST did not have sufficient rights in the deposits for the deposits to be taxable income upon receipt.

Accordingly, we hold that the security deposits received by NST are not includable in petitioners' taxable income because NST did not enjoy "complete dominion" over the deposits when the deposits were made.

Per order dated this day, *Oak Industries, Inc. v. Commissioner,* T.C. Memo. 1987-65, has been withdrawn.

*Decision will be entered under Rule 155.*